(No. 13606.—Appellate Court reversed; superior court affirmed.)
THE VICTOR CHEMICAL WORKS, Defendant in Error, *vs.*
ELLSWORTH ILIFF *et al.* Plaintiffs in Error.

*Opinion filed October 22, 1921—Rehearing denied Dec. 7, 1921.*

1. TRADE SECRETS—*what trade secret will be protected.* A trade secret which will be protected by injunction is a secret plan or process, tool, mechanism or compound known only to its owner and those of his employees to whom it is necessary to confide it.

2. SAME—*what is not a trade secret.* A process which is commonly known is not a trade secret and will not be protected by injunction, even though the manufacturer, in making use of the process, produces a product superior to that of any other on the market because of the mechanical skill in handling the product through the various stages of its manufacture.

3. SAME—*what is not proof of a secret process.* Proof of the many precautions taken by a company to prevent the disclosure of its method of manufacturing a chemical product may tend to prove that the process employed is a trade secret; but such proof, alone, cannot be held to establish that the process is secret when it is known and used by the outside world and the product can be successfully manufactured by use of published chemical literature on the subject.

4. SAME—*an employee may be enjoined from disclosing trade secrets.* A court of equity will restrain an employee from making disclosures or using trade secrets communicated to him in the course of a confidential employment, particularly where he has contracted not to do so; and persons who induce such disclosures by an employee knowing that he is under contract not to disclose or under such confidential relation will likewise be restrained from making use of the information so obtained.

5. SAME—*what complainant must prove to enjoin use of alleged secret process.* To warrant an injunction against a former employee from making use of an alleged secret process which he used while in the complainant's employ, the burden is on the complainant to prove that it was using the process and that it was a trade secret; that it was of value to it in the conduct of its business; that by reason of discovery or ownership it had the right to use the trade secret; and that the secret was communicated to the defendant while he was employed by the complainant in a confidential position, under such circumstances as to make it inequitable and unjust for him to disclose the secret and make use of it to the complainant's prejudice.

6. SAME—*when use of trade secret cannot be enjoined.*  An injunction against the breach of a negative covenant in any case is, in effect, enforcing specific performance, and as the principles upon which such an injunction and specific performance are granted are in the main the same, particularly as to proof of irreparable injury, a complainant chemical company will not be entitled to an injunction to prevent a former employee from using a secret process, which the company ceased to use before bringing suit.

7. SAME—*when contract of employment is in restraint of trade.* A contract of employment which prohibits an employee from directly or indirectly giving any person any information in regard to the whole or any part of the plant or processes of manufacture of the employer, and from doing anything which might injure, by competition or otherwise, the business of the employer, his successors or assigns, and which is unlimited as to time and place, is a contract in restraint of trade, where the employer has no trade secrets which he is entitled to protect.

WRIT OF ERROR to the First Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. CHARLES M. FOELL, Judge, presiding.

COOKE, SULLIVAN & RICKS, and DONALD H. MANN, (GEORGE A. COOKE, HOMER D. DINES, and EDWARD H. FIEDLER, of counsel,) for plaintiffs in error.

BUTLER, LAMB, FOSTER & POPE, (HERBERT POPE, RUSSELL WILES, CORNELIUS LYNDE, RALPH C. BLAHA, HARRY E. KELLY, FLETCHER LEWIS, and KARL D. LOOS, of counsel,) for defendant in error.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

The defendant in error, the Victor Chemical Works, filed in the superior court of Cook county its bill praying the court to enjoin the plaintiffs in error, Ellsworth Iliff, C. M. Bruff, John Flaig and the Iliff-Bruff Chemical Company, from in any manner, directly or indirectly, disclosing to any person or corporation, or using for their own

benefit, any knowledge or information relating to the plant, machinery, appliances, methods, processes, formulæ or business of the complainant pertaining to the manufacture and sale of phosphates, and from engaging in or becoming interested, directly or indirectly, as individuals, partners, stockholders, shareholders, directors, officers, clerks, principals, agents, employees, trustees, lenders of money, bondholders, or in any other relation or capacity whatsoever, in or about the business, other than that of complainant, of buying, manufacturing or selling phosphates within the United States or Canada. It was alleged in the bill that Iliff, while in the employ of the complainant and under contract with it of January 26, 1903, not to disclose anything in regard to the plant or processes of the complainant, had joined with C. M. Bruff and John Flaig in organizing the Iliff-Bruff Chemical Company and establishing at Hoopeston, Illinois, a competitive business. The contract is set out in the bill *in hæc verba,* and recites that complainant desires to employ Iliff and that he desires to take employment as foreman with complainant, and the covenants therein are in these words:

"*First*—The party of the first part hereby so employs the party of the second part, and agrees to pay him seventy-five (75) dollars per month on the last day of each calendar month, such employment to continue subject to termination by either party upon reasonable notice.

"*Second*—The party of the second part agrees at all times to devote his whole time and attention to the business of the party of the first part; to discharge faithfully the duties of said employment; to do his best to perfect and improve on the processes, machinery, tools and appliances used in the business; to fully disclose to and inform the proper representative, and him only, of the party of the first part of all improvements or discoveries made by him, or which he thinks by further investigation or experiment might be made, relating to or which might be useful

in connection with the business of the party of the first part, and on request to sign any and all papers which the party of the first part may by counsel be advised are necessary or proper to assure and secure to the party of the first part the full and exclusive right to such improvements, discoveries or inventions, and also not at any time, either during or subsequent to such employment, directly or indirectly, to give any person any information in regard to the whole or any part of the plant or processes of the party of the first part, and not to aid or do anything which might injure, by competition or otherwise, the party of the first part, its successors or assigns, in its said business, but, on the contrary, at all times to do all he can to prevent other persons from obtaining information of the whole or any part of the said plant or processes."

Complainant also alleged, in substance, that during the time Iliff was employed by it, it discovered at very great expense, and became and is the owner of, original and secret formulæ, methods, processes and appliances only known and used by it and certain of its employees in the manufacture of phosphates; that during Iliff's employment, and while relying on his agreement to guard and protect the interests and property of complainant, he was allowed by it free access to the whole plant, the records of the research work and experiments, and was given information and knowledge of the new and secret discoveries, re-actions, methods, processes and appliances so that he might use the same as employee and for the benefit of complainant; that by reason of such knowledge he became skilled in the manufacture of phosphates and the other products of complainant; that all of such information was imparted and confided to Iliff on the faith and reliance aforesaid and was and is secret and confidential and was at all times so understood by him, and that irreparable injury will be suffered by complainant if he be permitted to disclose or use such knowledge as a competitor or for a competitor of complainant.

The answer denied the existence of any such secret processes owned, held or used by complainant, and there was a hearing in private, behind locked doors, before the chancellor, who dismissed the bill for want of equity. Upon appeal to the Appellate Court for the First District that court in its decision held complainant was not entitled to an injunction against defendants restraining them from engaging or becoming interested in the business of buying, manufacturing or selling phosphates but was entitled to the other relief prayed, and reversed the decree, with directions to proceed in harmony with the views so expressed. A writ of *certiorari* was granted by this court for a review of the record on error.

The bill did not specify or describe any particular method, process or appliance owned or used by defendant in error. On the hearing it introduced in evidence a paper marked exhibit 6, entitled, "The lime process for neutralizing free phosphoric acid." The exhibit describes that process in this language:

"Two-thousand pounds of concentrated hot phosphatic liquor containing a substantial per cent of free phosphoric acid are run into a suitable mixing machine. In order to obtain the best results the temperature of the phosphatic liquor used should be at least 70 degrees C. If the liquor is weaker than 48 degrees Be., or an amount of free phosphoric acid is below forty-three per cent, we do not get as good a re-action between the liquor and lime, which results in much less evaporation of water or steam and consequently a wetter batch. If substantially all the phosphoric content in the liquor is in the form of free phosphoric acid ($H_3PO_4$) and of a Be. of approximately 48 to 55 degrees, it is not necessary to use a hot liquor but good re-action will be obtained by using a cold liquor. To this hot liquor (cold under the circumstances last named) add slowly about 250 pounds, more or less, as required, of freshly-burned unslaked lime, (CaO,) or the liquor may be added to the

lime if desired.   The amount of lime necessary is arrived at by determining the percentage of free phosphoric acid in the liquor and then calculating the amount of lime required to neutralize the free phosphoric acid in the 2000 pounds of this liquor.   As soon as they are brought together in the mixer there results a vigorous re-action between the caustic lime and the phosphoric acid, which re-action results in a great deal of heat.   This heat serves to convert into steam a large percentage of the free water present in the batch, thus leaving the batch at the conclusion of the re-action in a much drier condition than by the use of any other re-agent.   The lime used is preferably broken up to the size of a large walnut or small egg and should be of a high degree of purity in order to facilitate a more ready re-action with the phosphoric acid.   Not over three or four per cent of slaked lime ($CaO_2H_2$) should be present, as a higher amount than this reduces the heat accompanying the re-action, thus cutting down considerably the water evaporation and not producing as dry a batch.   The mixing machine is agitated slowly at first until the vigorous boiling accompanying the re-action has ceased, when the machine is agitated rapidly until the batch has become thick and is somewhat cooled, indicating that re-action is complete.   This should not require more than an hour.   At the beginning of the re-action a small amount of sodium chlorate should be present in the batch in order to eliminate organic matter.   The high temperature of the re-action,—one of the marked advantages of the use of caustic lime,—causes oxygen and chlorin to be liberated, which oxidize, and there-fore destroy organic matter, thus producing a product of a whiteness superior to that of any other method.   The same advantage of heat generated by the use of caustic lime would add to the effectiveness of any other oxidizing agent which might be used besides chlorate of soda."

Complainant limited its evidence to the purpose of showing the confidential relationship existing between it and Iliff

and the relation he bore to the firm of Petersen & Mansar, and to the proof of the process described in ·exhibit 6 and its secret nature. The proof as thus limited was to be considered by the court in determining the questions (1) whether or not complainant was entitled to a general injunction against engaging in the phosphate business at all; and (2) whether or not it was entitled to a specific injunction against disclosure of the re-agent and process described in exhibit 6. Complainant refused to submit any evidence of any other secret process it might have, but argued that on proof of the secret process submitted and such confidential relation it would claim a right to relief as to any secret process it might have and also to the general injunction aforesaid. The court allowed the complainant to so limit its proof and the issues without consent of the defendants to such limitation, and refused them the privilege of cross-examination or proof upon any matters not strictly within such limitation, and entered an order, over defendants' objection, enjoining and prohib'ting them, their attorneys, clerks, servants and all others acting for them, until further order of the court, from directly or indirectly disclosing any process, compositions of matter, or any new and useful improvement thereof, described in exhibit 6, including the disclosures to experts or facts witnesses produced at or during the taking of proof at the trial, but excepting therefrom defendants' solicitors or counsel.

The evidence discloses the following facts: The Victor Chemical Works was organized as a corporation in 1902 and purchased the plant and business of Petersen & Mansar, manufacturers of phosphates. Ellsworth·Iliff had been in the employ of Petersen & Mansar for about three years, and by the aid of a chemist was able to make phosphates when the firm sold its business to the Victor Chemical Works but not by the process disclosed in exhibit 6. He was employed by the Victor Chemical Works in the early part of January, 1903, and became foreman in charge of the manufacturing

processes, and continued in that capacity until he quit the work, July 8, 1914. He saw and became familiar with all the processes of that company before he left it and became a very efficient and valuable employee. He had access to the laboratory and voluntarily made some tests to discover and improve the processes in use there, and was receiving $75 per month for his services at and before the time he signed the written contract aforesaid. John Flaig was employed by the Victor Chemical Works about March, 1903, as a laborer, and became a foreman of the labor employees and later general foreman, with the duty to instruct the other foremen of labor and to see that the work was done properly. He left his employment in July, 1914, and thereafter Iliff and he and Bruff, who knew nothing about the business of manufacturing phosphates, organized the Iliff-Bruff Chemical Company, which established and operated a phosphate factory at Hoopeston, Illinois, and employed the same process and method of making monocalcium phosphate as that described in exhibit 6 aforesaid.

One of the products produced by complainant at its factory in Chicago is monocalcium phosphate, used in the manufacture of baking powders and self-rising mill products, and in the year 1914 it produced about sixty per cent of that product manufactured in the United States. Its claim is that it discovered the process described in exhibit 6 in April, 1912, for manufacturing monocalcium phosphate, and that it is the owner of the process, and that it is a secret process unknown to anyone and has never been used by others except it and the Iliff-Bruff Chemical Company, and that the latter company learned it only through Iliff, who obtained the knowledge thereof while holding a confidential relation with complainant and under contract to keep the process secret and not to engage in the manufacture or sale of complainant's product except with it, and that the other defendants had notice of such relationship and contract. The evidence does disclose that complainant first began

manufacturing monocalcium phosphate by the process described in exhibit 6 about April, 1912, and that it continued to so use that process until shortly before Iliff left its employ, when it abandoned it, temporarily at least, and was not using that process when this suit was begun. The evidence further shows that it returned to the use of this process some time after the suit was begun and was using it at the time of the trial.

Two of the main defenses relied on by defendants are, that the process described in exhibit 6 was a matter of common knowledge and had been discovered and used in the manufacture of monocalcium phosphate before its use by complainant; and that Iliff was the first discoverer of the process at complainant's plant, and that it is not the owner of the process and has no equitable right to it or to have Iliff or any of the defendants enjoined from using it. The lower court found for the defendants upon the first of these two propositions, and after considering all the evidence in the case we are satisfied that the weight of the evidence sustains the finding of that court.

Stripped of all unnecessary verbiage, the process of complainant amounts to this: Two thousand pounds of concentrated phosphatic liquor containing a substantial per cent of free phosphoric acid are run into a suitable mixing machine. To this liquor are added slowly about 250 pounds of unslaked lime $(CaO)$. Not over three or four per cent of slaked lime $(CaO_2H_2)$ should be present, so as not to reduce the heat accompanying the re-action and to produce a drier batch. The mixing machine is agitated slowly at first until a vigorous boiling accompanying the re-action has ceased, when it is agitated rapidly until the batch has become thick and is somewhat cooled. At the beginning of the re-action a small amount of sodium chlorate is added to the batch to eliminate organic matter. From evidence produced by complainant and from language used in exhibit 6 we learn that complainant used in its process either hot or

cold phosphatic liquor, depending on the specific gravity or degrees Baume of the liquor; also that in this process complainant used phosphatic liquor ranging from 30 degrees Baume or less to about 57 degrees Baume. It was the intent of the complainant to use liquor not weaker than 48 degrees Baume and in which the free phosphoric acid was not below 43 per cent to get good re-action and good results from it and the lime, but it was not always able to use, and did not always use, liquor of that special content and strength. The amount of lime to be used for 2000 pounds of the liquor is not necessarily just 250 pounds or any other specific number of pounds. We learn from the evidence of the complainant that the amount of lime not only depends upon the amount and strength of the liquor but also upon the quality and purity of the lime, which are not always the same. Its attempt was to obtain in the market freshly-burned lime of the purest and best quality and as free as possible from impurities, so the amount of lime for every batch was determined by a mathematical process after the liquor and the lime had been tested and their qualities reported by the chemist employed by complainant. The actual proof is that every batch was thus tested and calculations made as to the relative amount of liquor and lime to be used. It was also permissible to either add the lime to the liquor or to run the liquor onto the lime after the tests had been made. Sodium chlorate is later added to the mixture for the sole purpose of oxidizing or burning up the impurities in the mixture that might otherwise be deposited in the batch which contains the monocalcium phosphate in its unfinished stage. We also learn from the evidence of the complainant as well as from exhibit 6 that other oxidizing agents than sodium chlorate might be used with equally good results; that it is not necessary to use just 2000 pounds of the liquor or any other number of pounds, but whatever number is used the lime must be proportioned as aforesaid; that the vigorous re-action and great amount of heat which result from the

mixture are merely the natural result, and that by reason thereof the mixture will boil over and waste if the mixing machine is not agitated slowly at first until the vigorous boiling begins to cease, when the machine may be agitated as rapidly as desired to thicken and cool the batch; that no particular size of the lumps of the lime was, in fact, used by complainant, but varied from the size of a small egg or walnut to lumps weighing three or four pounds. There is no claim that the same result would not happen if the lumps of lime were decreased to the size of a pea or even ground to a powder. It was claimed by complainant that if the lime were ground to a powder the powdered lime would tend to absorb moisture and the result of the process be impaired, but this is positively refuted by the testimony of the defendants' expert witnesses.

Unslaked lime, the symbol for which is CaO, is also commonly known as caustic or quicklime and is made and sold in various parts of this country in various degrees of purity, depending largely upon the manner in which it is burned and the fuel used in burning it, as well as upon the contents of the original rock which is burned in the making of it. It is a well known fact in chemistry, as shown by the evidence and by chemical literature, that lime salts have the effect to neutralize the free acid in the phosphatic liquor mentioned in exhibit 6. They are therefore called re-agents. The re-agents or lime salts that have been used in this country by chemists and manufacturers of phosphates, as is shown by the evidence, are unslaked lime ($CaO$), hydrated or slaked lime ($CaH_2O_2$), carbonate of lime ($CaCO_3$), dicalcium phosphate, or dicalcic ($Ca_2H_2P_2O_8$) and tricalcium phosphate ($Ca_3P_2OH$).

The claim of plaintiff that the use of unslaked lime as a re-agent was discovered by it and was unknown and unused as a re-agent by other manufacturers and chemists is overwhelmingly disproved by the weight of the evidence in this case. That claim was supported by the testimony of August

Kochs, president, and Robert A. Holbrook, an expert chemist and employee of complainant. They admit by their own testimony that they were never in any other factory where monocalcium phosphate was manufactured nor know that other manufacturers did not employ that re-agent. By the testimony of two expert chemists, John A. Wesener and W. E. Wadman, witnesses for the defendants, and Dr. Charles Ludwig Kressel, it is abundantly proved that unslaked lime has been used as a re-agent for the purpose aforesaid in this country or discovered as a re-agent many years before complainant's factory was established, and that chemical literature shows a discovery as far back as 1875 or earlier. It is unnecessary to discuss the evidence in detail in the record on that question, as there absolutely can be no doubt that the weight of the evidence is with the defendants upon this point. Dr. Wesener testified positively that he had made an examination of chemical literature for the purpose of ascertaining what information he could get therefrom as to monocalcium phosphate, and found that that product had been known to the chemical world as early as 1846, and that caustic or unslaked lime is mentioned in the history as a re-agent to neutralize the phosphatic liquor in the manufacture of that product. He also testified that such literature tells how to make monocalcium phosphate by the use of unslaked lime, and while testifying he quoted from a number of text books to prove his assertion. He also in very positive terms gave it as his opinion as an expert that any person who has graduated in chemistry from the University of Michigan, or a like institution in point of efficiency, would be able, before he had any practical experience in business, to obtain from chemical literature sufficient information to make monocalcium phosphate by the use of lime as a re-agent. He himself obtained knowledge from chemical literature that caustic lime is used in the manufacture of that phosphate, and, before he knew that any manufacturer in this country was using lime as a re-agent in the

manufacture of that product, he by the use of unslaked lime as a re-agent in the phosphatic liquor manufactured monocalcium phosphate, which was a commercial product having a neutralizing strength of 76 and better and contained only 98/100 of one per cent of free phosphatic acid, which is a high grade commercial product according to the experts' testimony. He referred to it as a very perfect product. His testimony as to the concentration of the phosphoric acid corresponds in substance to that of the formula described in exhibit 6, and he states that it should be concentrated so as to contain from 35 to 58 per cent of phosphoric acid. He also manufactured monocalcium phosphate by the use of several other re-agents already named to neutralize the phosphatic liquor.

The testimony shows that the method of combining the various elements named in exhibit 6 and milling or mixing them is not secret and was not first discovered by complainant, as contended by it. Dr. Wadman, for the defendants, testified that he was employed by the Hygienic Chemical Company for nearly twenty-two years as chemist and superintendent and was employed before that by the firm of Heller, Hirsch & Co., which firms manufactured calcium phosphate, and that he manufactured that product for them from 1889 to 1914, and in its production used all of the re-agents heretofore named, including unslaked lime. He used the phosphatic liquor, when using unslaked lime, concentrated in the same manner and of practically the same strength as that described in exhibit 6. To use his own language, his personal practice was to concentrate his liquor to 46 to 52 degrees Baume, and when he used unslaked lime he usually concentrated it to about 50 degrees, and to about the same degree when he used slaked or carbonate of lime, and if dicalcic was used he made it still stronger. He used the concentrated liquor both hot and cold, and the amount of unslaked lime that he used, as was the case with the complainant, was determined after the lime and liquor had

been tested, and was proportioned according to the strength and purity of each. He used a mill or mixing machine to mix or mill the product as did complainant, and also used the same oxidizer, sodium chlorate, and he describes the results of the batch in the mixing machine as to heat and boiling as does complainant. The main difference between his manufacturing of the product and that of the complainant is that he varied his methods of oxidizing his product. Sometimes he would use his oxidizer before combining the liquor and the lime and sometimes he would add it in the mixer, as did complainant. He generally used his unslaked lime pulverized and sometimes he would add pulverized lime to his product after he had taken it out of the mill for perfecting and drying the completed product. So far as complainant's process is concerned, every feature and principle of it was known and used by this witness and his companies about twenty-three years before it was used by complainant, and he made a commercial product that tested, according to his method of calculation, about 65, which, according to other methods of calculation, would be a test of 70 or more, and even as high as 80, and containing only about three-fourths of one per cent of free phosphoric acid. Any monocalcium phosphate containing less than two per cent of free phosphoric acid and a testing strength as high as Dr. Wadman's product is considered by the experts a high-grade commercial article.

The testimony does show that complainant made a high grade phosphate and that it was the principal manufacturer of that product in this country,—that is, it manufactured and sold more of it than any other manufacturer in the country. If its claim of superiority in its article of monocalcium phosphate be proved, it is not because of the fact that the process described in exhibit 6 is a secret process, but because of the mechanical skill of complainant in handling the product through the various stages of its manufacture. "A trade secret is a plan or process, tool, mechan-

ism or compound known only to its owner and those of his employees to whom it is necessary to confide it.  *  *  * A process commonly known in the trade is not a trade secret and will not be protected by injunction, but the mere fact that there are secret processes of a different kind accomplishing the same result will not prevent the granting of an injunction." (22 Cyc. 842.) The evidence in this record discloses that there are a number of processes in which different re-agents are used to manufacture the same article, monocalcium phosphate. These processes are different because the re-agents are different and the mode of combining the various elements of the process are shown to be different. If complainant was using a different re-agent with the phosphatic liquor and the oxides to produce monocalcium phosphate, and one that had never been used or discovered by other manufacturers or chemists, it could successfully claim that it has a secret process. But that is not the case here. It uses the same re-agent and the same liquor and the same oxidizer as did Dr. Wadman and his companies, and he made the same tests as to the proportions to be used in the mixture and in the same manner. It uses a mill to mill the product or mix it, just as Dr. Wadman did. There is no claim that the process is secret because of its manner of milling it, or by reason of the character of the mill that it uses in milling it, or because it produces a different product. Dr. Wadman produced the same product, monocalcium phosphate, and if complainant made a better product it was better only because it employed better mechanical skill in using the process. "A process is a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject matter to be transformed and reduced to a different state or thing.  *  *  * The process requires that a certain thing should be done with certain substances and in a certain order." *(Cochrane* v. *Deener,* 94 U. S. 780.) A mere mechanical advance in the use of a process is not a new process

or discovery.   To be a new process there must be employed creative faculties in originating it amounting to a meritorious discovery or invention.   *Expanded Metal Co.* v. *Bradford,* 214 U. S. 780; *Bell & Bogart Soap Co.* v. *Petrolia Manf. Co.* 54 N. Y. Supp. 663.

Complainant has proved that it exercised great caution in protecting at its plant what it termed its trade secret.   It built high walls and fences to keep out all individuals who might become interested in knowing how it manufactured its product.   It employed watchmen and instructed all of its foremen to exclude all persons from the premises who might be of that inquiring nature, and its general rules were that no one should be admitted to its plant or grounds unless he had a pass expressly given by the company for admission. Its chemists and Iliff were under contract not to disclose its supposed secrets.   It has only attempted to prove that it has one trade secret, which is described in exhibit 6.   It has made no attempt to prove that it has any other trade secrets, and the proof is that that process was known and used by the outside world long before complainant ever used it, and that such process was and can be successfully worked out and used by a good knowledge of chemistry and by the information that is furnished in chemical literature.   Proof of the above character is sometimes treated by the authorities as going a long way in the proof that a given thing is a trade secret, but such proof, alone, cannot be held to establish that the process is secret when it is known and used by the outside world and can be successfully used by use of published chemical literature on the subject.   *Dow Chemical Co.* v. *American Bromine Co.* 177 N. W. 996; *In re Bolster,* 59 Wash. 655.

It is well settled by the decisions of the courts of this country and of England that courts of equity will restrain an employee from making disclosures or use of trade secrets communicated to him in course of a confidential employment, and particularly if he has contracted not to do so,

where all the facts warrant such relief. It is also true that persons who induce such disclosures by an employee knowing that he is under contract not to disclose or under such confidential relation will likewise be restrained from making use of the information so obtained. The burden of proof in such case is upon the complaining party. To be entitled to relief in this case complainant was required to prove that it was using the process of manufacture disclosed in exhibit 6 and that it was a trade secret; that it was of value to it and important in the conduct of its business; that by reason of discovery or ownership it had the right to use and enjoy the trade secret; and that the secret was communicated to Iliff while he was employed and under contract and in a position of trust and confidence, under such circumstances as to make it inequitable and unjust for him to disclose the secret to others and make use of it to complainant's prejudice. It has failed to prove the first and essential element of its case,— that its process is a trade secret. It must, therefore, necessarily fail to recover in this suit. *Macbeth-Evans Glass Co.* v. *Schnelbach,* 239 Pa. 76; *Brunson* v. *Reinberger & Collier* 134 Ark. 211; *American Stay Co.* v. *Delaney,* 211 Mass. 229; *Nessle* v. *Reese,* 49 Barb. 374; *Shonk Tin Printing Co.* v. *Shonk,* 138 Ill. 34; *Pope Manf. Co.* v. *Gormully & Jeffery Manf. Co.* 12 Sup. Ct. 643.

The evidence shows that Iliff was the discoverer of the process described in exhibit 6. The undisputed evidence shows that in January, February and March of 1912 Iliff made about seventy tests with caustic lime as a re-agent, for the purpose of ascertaining if monocalcium phosphate could be successfully made by the use of that re-agent, and that by employing the process in question he discovered complainant's alleged secret. Kochs, president of the complainant, testified that these experiments were under the supervision of Iliff. Later he testified that he understood that Iliff had a lot to do with discovery of the lime process, because he carried on the factory experiments. Holbrook

testified as to Iliff making these experiments.  Later he testified that Iliff had a very important part in the experiments of January, February and March, 1912, because he was specially superintending them.  John Flaig testified that this lime process was referred to in the plant, after it was discovered, as Iliff's process, and that Holbrook, the chemist of complainant, referred to the process as Iliff's process, and that Iliff called it his process.  Flaig's testimony in this particular is not contradicted.  After it was reported to Kochs that the tests of Iliff were producing satisfactory results, Holbrook, for the purpose of ascertaining the merits of Iliff's discovery, made fifteen tests from April 17, 1912, to May 3, 1912, in the manner that Iliff had made his.  In those fifteen tests 250 pounds of unslaked lime were used in the batch with 2000 pounds of phosphatic liquor, and it clearly appears from Holbrook's testimony that tests numbered 1, 2, 3, 4, 6 and 9 produced a commercial product of monocalcium phosphate.  The results of the remainder of the fifteen tests are not given, but the evidence in the record leads to the conclusion that they all produced a commercial product.  Holbrook testified that test No. 1 produced a better quality of phosphate than No. 2, and that No. 6 test showed a better result than No. 1.  In all these fifteen experiments the liquor was concentrated to a strength of from 48 to 50 degrees Baume, the same being tested in every instance before it was used in the experiment.  The acidity of the liquor tested all the way from 83 to 89.  The time used in mixing the batches occupied from forty-five minutes to an hour.  The product of test No. 1, after it had dried, showed seven-tenths of one per cent of free acid and a strength of 75.2 in liquor, both hot and cold.  Test No. 2 showed less than two per cent free acid and tested 76. Test No. 4 showed practically no phosphoric acid and tested 74.5 in liquor, both hot and cold.  The record does not disclose clearly the amount of free acid in the other batches produced by the other tests.  A comparison of these tests

with the process described in exhibit 6 makes it certain that that process is the same as that discovered by Iliff. In fact, the discovery of this process is shown by the evidence of complainant to have been made in the early part of 1912 in complainant's plant by the experiments above related and that it was used there from that time up to 1914. Holbrook had in 1909, in his experiments in complainant's plant, tried to use caustic lime as a re-agent to neutralize phosphatic liquor and to produce monocalcium phosphate, but he was not successful. He testified that the cause of his failure was that he did not work with liquor of proper temperature and of proper concentration or strength, and that he did not again attempt this experiment until he made the fifteen experiments in April, 1912, according to Iliff's method. The evidence further discloses that he had little faith in the success of Iliff's experiments until after he had made the fifteen tests aforesaid.

There is no possible theory, under the showing in this record, upon which complainant's bill may be maintained under our findings. Complainant has failed to prove its material allegation that it discovered the process and that it was a secret process. Its allegation that it is the owner of the process is not maintained, even if it were a secret process. Iliff, the discoverer thereof, has never conveyed his right to complainant but has simply covenanted that he would transfer it to complainant on request. No request has ever been made of him by complainant to transfer it. The record also shows that there was no sufficient consideration for the specific performance of the contract. He got no money or property for signing the contract, by way of increase in wages or otherwise. He got no extension of time of his contract of employment. The contract does not bind complainant to keep him in its employment for any length of time but reserves the right to terminate it at any time on reasonable notice. It would be very inequitable to

enforce this contract even if the process aforesaid were secret. To award the injunction prayed for in this case would amount to compelling specific performance. An injunction against the breach of any negative covenant in any case is, in effect, enforcing specific performance. The principles upon which such an injunction and specific performance are granted are in the main the same, and particularly where there is a failure to prove an allegation of irreparable injury. Complainant had ceased to use the lime process referred to in exhibit 6 before bringing its suit. If a contract is palpably unfair and inequitable and complainant is attempting to enforce an unconscionable bargain, it is not entitled either to the equitable remedy of injunction or of specific performance. 22 Cyc. 842-851, incl.; *Galzell* v. *Dueber Watch-Case Manf. Co.* 13 Sup. Ct. 886.

The contract is one in restraint of trade and void. It prohibits Iliff from directly or indirectly giving any person any information in regard to the whole or any part of the plant or processes of complainant, and from doing anything which might injure, by competition or otherwise, the complainant, its successors or assigns, in the business. The restraint is unlimited as to time and place, and the proof does not show that complainant has any trade secret whatever. *Hursen* v. *Gavin,* 162 Ill. 377; *Lanzit* v. *Sefton Manf. Co.* 184 id. 326; *Tarr* v. *Stearman,* 264 id. 110; *Taylor Iron Co.* v. *Nichols,* 73 N. J. Eq. 684.

The order and judgment of the Appellate Court are reversed and the decree of the superior court is affirmed.

*Judgment of Appellate Court reversed.*
*Decree of superior court affirmed.*