**B. F. GLADDING & CO., Inc., Appellant,**

v.

**SCIENTIFIC ANGLERS, Inc., Appellee.**

**No. 12958.**

United States Court of Appeals
Sixth Circuit.
June 12, 1957.

Theodore E. Simonton, Cazenovia, N. Y., Arthur J. Kinnane, Bay City, Mich., on brief, for appellant.

Dean Laurence, Washington, D. C., Laurence, Wiest & Sherman, Washington, D. C., F. Norman Higgs, Bay City, Mich., on brief, for appellee.

Before SIMONS, Chief Judge, ALBERT LEE STEPHENS of Ninth Circuit and McALLISTER, Circuit Judges.

ALBERT LEE STEPHENS, Circuit Judge.

This is an action originally brought by B. F. Gladding & Co., Inc., a New York corporation, an old, established fishing line manufacturer, against Scientific Anglers, Inc., a Michigan corporation, for specific performance of a contract, violation of trade secrets and for unfair competition. Scientific Anglers, Inc., was incorporated in 1946 with Leon P. Martuch as president and Clare S. Harris, vice-president, secretary and treasurer. Sometime in 1947 Gladding became the sole distributor of certain fishing line coating products then being made and sold by Scientific. On December 1, 1950, a written contract was entered into between Scientific and Gladding, and the issues of this case revolve around that contract. It will be sufficient to quote therefrom paragraphs 2, 8, 9, 10 and 13 which we cite in the margin.[1]

---

1. "2. Gladding hereby agrees to employ Scientific for the term of this agreement, as consulting engineers for Gladding engaged in working on such of the development, engineering, production and marketing problems of Gladding as may from time to time be assigned to Scientific, and Scientific hereby accepts such employment. Gladding understands the other activities of the several employees of Scientific, and Gladding will not make unreasonable demands over long periods of time on Scientific's personnel. Approximately six (6) trips a year from Midland to South Otselic may reasonably be required of Scientific, the reasonable out-of-pocket expenses of such trips to be borne by Gladding. Gladding is to pay Scientific a quarterly fee of Twenty-five Hundred Dollars ($2500.00), payable in advance for each quarter, except that the payment for the first period shall be Three Thousand Three Hundred and Thirty-three dollars and thirty-three cents ($3333.33) and shall cover the four (4) months ending March 31, 1951 and shall be paid forthwith upon the execution and delivery of this agreement. It is expressly understood that Scientific will not do work similar to that which it is to do for Gladding for any other manufacturer of fishing lines and other products that are related to Gladding's business, during the term of this agreement, whether on a consulting basis or otherwise."

"8. The parties contemplate that Scientific will become intimately familiar with Gladding's business, and that Gladding will be fully informed by Scientific with respect to such products made by

During the operative existence of the contract (December 1, 1950 to December 31, 1953), a fishing line was developed chiefly by Scientific which has been and is being marketed by Gladding under the trade name of "Aerofloat." The "Aerofloat" line is unusual in that because of the presence of numerous gas bubbles beneath the line coating, it will float; and for that reason is especially suitable for dry fly fishing. Some time after the contract had expired, Scientific began to make and sell an "Air Cel" fishing line which is similar, if not the same, as Gladding's "Aerofloat" line. Mr. Martuch, president of Scientific, after the contract terminated, filed two patent applications which cover the "Aerofloat" line development. One application (Serial No. 403,823), filed January 13, 1954, disclosed the precise combination of variable orifice die and automatic timing mechanism that has been used by both parties in the manufacture of their re-

Scientific as Gladding may purchase from Scientific developed during the term of this agreement. Each of the parties agrees that, during the term of this agreement, it will not disclose or divulge to any unauthorized person, any of the formulas, processes, machines or apparatus (secret or otherwise), pertaining to the business in which the other party is or may become engaged during the term of this agreement. Each of the parties further agree that at no time, either during the term of this agreement or thereafter, will it disclose or divulge to any unauthorized person any trade secrets of the other party, or any confidential information relating to the other party's business of which it may gain knowledge during the term of this agreement, unless and until such time as said other party shall make public such trade secrets or confidential information."

"9. Nothing contained in this agreement shall prevent Scientific from working upon any projects relating, directly or indirectly, to the manufacture of fishing products other than the projects which may be undertaken by Scientific for Gladding pursuant to Article 2 hereof. Scientific agrees that Gladding shall have the first refusal of rights under any inventions, discoveries and improvements made by Scientific heretofore or hereafter during the term of this agreement relating, directly or indirectly, to the manufacture of fishing products, and not arising out of the work done by Scientific for Gladding pursuant to the provisions of Article 2 hereof. To this end, Scientific shall promptly furnish Gladding with a copy of any patent application filed thereon, and Gladding shall thereupon advise Scientific in writing within three (3) months from the receipt of such application copy, as to whether or not it is interested in negotiating with respect to the acquisition of rights thereunder. In the event that Gladding is not so interested, nothing contained in this agreement shall prevent Scientific from proceeding to attempt to exploit said rejected inventions, discoveries and improvements through other manufacturers of fishing products or otherwise. In the event that Gladding is so interested, negotiations shall proceed with all reasonable dispatch, and in the event of failure to reach an agreement within a reasonable time, Scientific shall have the right, after thirty (30) days' notice in writing to Gladding of its intention so to do, to attempt to exploit any inventions, discoveries and improvements upon which negotiations have thus failed through other manufacturers of fishing products or otherwise. It is expressly understood and agreed that in any such negotiations Scientific will not request a royalty rate greater than five per cent (5%) of net sales."

"10. Any inventions, discoveries and improvements made by Scientific during the term of this agreement and arising out of work done by Scientific for Gladding pursuant to the provisions of Article 2 hereof, shall be promptly disclosed in writing by Scientific to Gladding, and Gladding shall have a non-exclusive, royalty-free license or shop right to make, use and sell the same in connection with its business, such license or shop right to be non-assignable save to the purchaser of substantially all of Gladding's fish line business. Scientific agrees promptly to furnish Gladding with a copy of any patent application filed by it on any inventions, discoveries and improvements thus arising out of its employment by Gladding, and Gladding shall have the first refusal of exclusive rights thereunder, and negotiations to that end shall be conducted in the manner set forth in Article 9 hereof."

"13. Termination of this agreement for any reason whatsoever shall not affect any rights of either party accruing prior to the date of such termination, nor shall it affect any licenses or shop rights acquired by either party hereunder."

spective "Aerofloat" and "Air Cel" lines. The other application (Serial No. 447,-068) covers the "Aerofloat" and "Air Cel" lines as articles of manufacture. These applications were assigned to Scientific.

Gladding, acting under assumed rights by virtue of the contract, indicated to Scientific that it was interested in securing exclusive rights under the patent applications, and differences of opinion arose as to such assumed rights. After a series of letters had failed to compose the differences, Gladding brought the instant action in the District Court on January 19, 1955. Various hearings, motions, etc., were made and heard before the District Court, and on May 2, 1955, upon Gladding's petition, that Court granted a preliminary injunction against Scientific effective June 15, 1955. Gladding was required to post a $2,000 bond. Trial of the case was held in August, 1955.

March 9, 1956, the District Court filed an opinion (B. F. Gladding & Co., Inc., v. Scientific Anglers, Inc., 139 F.Supp. 236) in which it was stated that proper negotiations still had not been held pursuant to Article 10 of the contract and that unless Gladding was willing on or before April 14, 1956 (later extended by order of the Court), to meet a royalty charge up to five per cent (5%) on its net sales of the bubble or float line, that it no longer would have any rights in the patents applied for or to in any way interfere with the obtaining of the patents applied for by Scientific. In the opinion it was specifically held that Scientific had no right to condition negotiations on the guarantee by Gladding to pay minimum royalty on the basis of the sales of a certain number of the bubble lines. Other findings in the opinion we will later discuss.

Scientific and Gladding further negotiated. But Scientific insisted upon conditions which Gladding was unwilling to accept. The trial judge, in order to assist the parties, wrote several letters to their attorneys. Gladding by letter dated March 20, 1956, expressly agreed to pay 5% royalty and also agreed to include a so-called "anti-shelving provision" in the license whereby Gladding would be required to make "substantial use" of the inventions covered by the patent applications, and further that if "substantial use" was not made, Scientific would have the right, upon sixty days notice, to cancel the license. Scientific again refused to accept Gladding's offer and insisted upon certain provisions to which we shall later advert.

Upon April 17, 1956, the trial judge, in a letter to the attorneys for the parties, again attempted to suggest possible solutions of their differences. The District Judge, in this letter and contrary to his former expressed view, stated that a minimum royalty should be included in any licensing agreement and suggested a minimum annual figure of $12,500.-00. It was further stated in the letter that, in the event Gladding's business was insufficient to meet such minimum royalty, Scientific could, in thirty days, cancel the exclusive license and Gladding would then *"have no license at all."* Gladding was unwilling to agree to these conditions, and in a subsequent letter to the trial judge attempted to explain that the Judge's position as to the requirements of a minimum royalty was inconsistent with his earlier position and in law was unsound. Gladding also wrote that if the Judge insisted on a minimum royalty provision in the compromise agreement, it would acquiesce up to the minimum amount of $3,500, stating that it was customary to set the minimum annual royalty at not more than one-half of the expected royalty income for an average good year, and that their expected yearly sales would amount to $7,000.[2]

2. The District Court later on June 4, 1956, when judgment was entered, made the statement in court that Gladding's attorneys had not, prior to that time, indicated that there was any custom or usage as to fixing the amount of a minimum royalty. The evidence is clearly the other way. Mr. Simonton, attorney

Scientific was unwilling to accept $3,500 as a minimum royalty, but following the Judge's suggestion, demanded $12,500; and in addition demanded that should Gladding lose the exclusive license from failure to pay the minimum royalty so demanded, then Gladding would also lose its non-exclusive license or shop right it already possessed.

Later, at the suggestion of Judge Picard, Scientific consented to a minimum royalty of $8,500. But, significantly, Scientific still insisted by letter, dated May 14, 1956, that Gladding would lose *both* its non-exclusive license or shop right and exclusive license if Gladding should fail to meet the minimum royalty which might be agreed upon.

On May 18, 1956, the District Court filed an amended opinion in which it was stated that Gladding refused to enter into an exclusive license on reasonable terms with Scientific and that the only course open to the Court was to dismiss Gladding's bill of complaint and dismiss the injunction it had issued upon Gladding's petition.[3] See B. F. Gladding & Co., Inc., v. Scientific Anglers, Inc., 141 F.Supp. 630, 631.

Judgment was entered on June 4, 1956, dismissing Gladding's bill of complaint and quashing the injunction. Scientific was awarded damages arising out of the loss of business during the period of the temporary injunction, and Scientific was held to be entitled to reasonable attorney's fees, disbursements and costs. Gladding appealed.

### The Appeal

■ Appellant Gladding initially argues that, under the contract entered into by the parties, Scientific was obligated to grant to Gladding an exclusive license if Gladding was willing to pay the top royalty rate of five per cent stipulated in the contract and that no other negotiations or terms were to be considered. Appellant cites our decision in Cold Metal Process Co. v. Republic Steel Corp., 6 Cir., 233 F.2d 828, 829, 844, in support of this position. While the Cold Metal case is similar, it is not on all fours with the *instant* case. In the Cold Metal case, Cold Metal agreed "3. When and if such claim or claims to common subject-matter are granted in any patent issued on Cold Metal's applications, Cold Metal shall grant to United a license to make, use and sell rolling mills under such claim or claims, which license shall be exclusive to United * * *." Cold Metal in addition reserved the right to use the same patents in its own plant or plants. In the Cold Metal case negotiations were to take place as to the payment to be made by United to Cold Metal. Cold Metal Process Co. v. United Engineering & Foundry Co., 3 Cir., 107 F.2d 27, 28. In the instant case the agreement provided that Gladding "shall have the first refusal of exclusive rights thereunder."

We are of the opinion that under the terms of the contract Gladding had an inchoate right to an exclusive license under any patent application filed by Scientific. All terms and conditions of any proposed licensing agreement were not and probably could not have been set forth clearly in the contract. The basis of the right was set out, while conditions, terms and provisions were left to agreement appropriate in the circum--

---

for Gladding, in a letter dated April 21, 1956, to Judge Picard made a detailed explanation as to what the custom was when such a minimum royalty provision was to be included in a licensing agreement. Scientific also admitted on June 4, 1956, in open court, that Gladding was then making sales of its "Aerofloat" line which, on the basis of a 5% royalty, would amount to only $7,000 per year.

**3.** In this amended opinion it was stated "It. [Gladding] has refused to agree to

any minimum number of bubble lines it would be obliged to pay for during each year * * *." This is clearly incorrect. Gladding was reluctantly willing to agree to a $3,500 minimum, but with the Judge and Scientific insisting on a figure of $8.500 *plus* the loss of the non-exclusive license for failure to pay the minimum royalty, Gladding took the position that Scientific was entitled to no minimum royalty.

stances. In De Stubner v. United Carbon Co., D.C., 67 F.Supp. 884, affirmed 4 Cir., 163 F.2d 735, a licensing agreement was construed in which no minimum royalty of any kind was provided for, but in which royalties were to be paid on products made under the license according to a rate which was not fixed therein, but which was to be later determined in the light of market conditions. The Court stated (67 F.Supp. page 893): "The Court cannot go beyond the agreement of the parties and establish a minimum royalty where none was provided for by the parties themselves." We are in accord with the above statement.

Gladding was fully aware that Scientific should be protected against non-use of the patents by Gladding, and was willing to include in the licensing agreement a so-called "anti-shelving" provision whereby Gladding would be required to make "substantial use" of the patents in order to continue in possession of the exclusive license.

When Gladding asked for an exclusive license, Scientific insisted upon one condition which Gladding was under no obligation to accept. Under Article 10 of the original contract, Gladding was granted a non-exclusive license or shop right in any invention, discovery or improvement made by Scientific during the term of the agreement and arising out of work done by Scientific for Gladding. It was clearly stated in Article 13 that should the agreement terminate, the termination would not "affect any licenses or shop rights acquired by either party hereunder." Scientific had no right to insist as a condition to granting an exclusive license that, should Gladding fail to pay the requisite royalties, the exclusive license would end *together with* the previously acquired non-exclusive license or shop right.

The contract secures to Gladding an inchoate right to receive an exclusive license providing Gladding was willing to pay up to a 5% royalty and to abide by reasonable working terms and conditions. But such working terms do not, of course, authorize Scientific to insist on a minimum royalty or to insist on the loss of the non-exclusive license or shop right should the exclusive license fail. To hold otherwise would be to destroy the value of Gladding's right of "first refusal" in any patent application filed by Scientific.

We have carefully read the exchange of correspondence between Scientific, Gladding and the District Judge and can reach no other conclusion than that the trial judge's finding that Gladding was unwilling to enter into an exclusive license on reasonable terms is clearly erroneous. United States v. Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746. Scientific was insisting on unreasonable conditions, which, under the contract, Gladding was not obliged to accept. The evidence strongly indicates that Scientific was trying to avoid granting an exclusive license. On the other hand, Gladding made concessions which it was not obliged to make. Gladding is thus entitled to specific performance of the contract, without concessions outside its terms, the principal provision of the contract being that Gladding is to pay, as it has agreed, 5% royalty; and the minor provisions being reasonable working terms and conditions, which the trial court may provide in its decree.

### Trade Secrets

Gladding next argues that Scientific is not entitled to use the trade secrets that constitute *unpatentable* contributions to the "Aerofloat" line development prior to public disclosure. Gladding alleges that some of the unpatentable trade secrets are described in explicit detail in the bubble line patent application and others are not covered by either patent application. Gladding claims sole ownership of these trade secrets by virtue of the employment provided for in Article 2 of the contract in suit. The District Court held that no trade secrets *exclusively* belonging to Gladding were included in the bubble line as manufactured in the finished product or through the patents applied for, and that any trade

secrets existing were either those developed by Scientific alone or by both Scientific and Gladding. The Court also held that the contract was designed to cover unpatentable as well as patentable processes and that it was contemplated by the parties that both were to enjoy the fruits of their efforts. The Court further held that the contract was not one to "invent" and that Scientific was an independent contractor and not an employee within the meaning of the patent law.

■■ A trade secret may be defined as any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. Restatement of Torts, Vol. IV, § 757(b). The protection given to trade secrets is against breach of faith and reprehensible means of learning another's secrets. In order for one to secure such protection it is necessary to show that (1) the subject matter of the designated trade secret is in fact secret, (2) that one is the owner or possessor of such secret, (3) and that the person who is using or disclosing or attempting to disclose the trade secret acquired it in such a manner that a disclosure by him would amount to a breach of confidence as to the person who disclosed it to him.

■ The usual trade secret case arises out of the employer-employee relationship whereby an employee acquires knowledge of the trade secret of his employer because of a confidential relationship. The instant case is somewhat unusual in that the alleged trade secrets of appellant here sought to be protected were not in existence when Scientific entered into the contract with Gladding. They were developed after the contract was executed and were either jointly developed by Scientific and Gladding or by Scientific alone. Gladding here makes no complaint of the finding of the trial court that the "Aerofloat" line was a joint development. But Gladding says even though the secrets may have been jointly developed, they are still the exclusive secrets of Gladding because of the contract entered into by the parties. Gladding cites Fairchild Engine and Airplane Corp. v. Cox, Sup., 50 N.Y.S. 2d 643, for the proposition that a process or development need not be patentable to get protection against disclosure as a trade secret. With this we agree. But the Fairchild case is distinguishable from the instant case and does not aid in the determination as to ownership of the trade secrets in the instant case. In the Fairchild case, a process of bonding aluminum to steel was developed by two employees of Fairchild who were employed to "invent" and advance the process. A former vice-president and director of Fairchild, who had acquired knowledge of the process while so employed, was disclosing, or about to disclose, the process to another company. But, significantly, in the Fairchild case, the process or trade secret clearly belonged to Fairchild because of the fact that the two employees were employed by Fairchild for the specific purpose of inventing and developing the process. That is not the situation in the instant case. The contract clearly covered patentable developments or inventions made by Scientific. It provided that Scientific had the right to file patent applications on such inventions and Gladding was to have a shop right or non-exclusive license with the right of "first refusal" as to securing an exclusive license. Gladding argues that Scientific was limited to *patentable* contributions or developments it made and that the *unpatentable* processes were to be the exclusive trade secrets of Gladding.

Article 8 of the agreement provides in part:

"* * * Each of the parties agrees that, during the term of this agreement, it will not disclose or divulge to any unauthorized person, any of the formulas, processes, machines, or apparatus (secret or otherwise), pertaining to the business in which the other party is or may become engaged during the term of

this agreement. Each of the parties further agree (sic) that at no time, either during the term of this agreement or thereafter, will it disclose or divulge to any unauthorized person any trade secrets of the other party, or any confidential information relating to the other party's business of which it may gain knowledge during the term of this agreement, unless and until such time as said other party shall make public such trade secrets or confidential information."

■ From a careful reading of Article 8 it can be seen that it was primarily placed in the contract to protect the trade secrets "of the other party" and does not necessarily cover trade secrets which might be jointly owned and/or developed by both of the parties *after* the agreement. Even without any specific mention in the contract joint trade secrets would be protected against unlawful disclosure by one of the parties.

■ After careful consideration of the provisions of the contract, we do not feel constrained to upset the findings of the District Court that the parties contemplated that both would enjoy and control the fruits of their efforts and that no exclusive trade secrets of Gladding are being used by Scientific. See Victor Chemical Works v. Iliff, 299 Ill. 532, 132 N.E. 806, 807 and New Method Die & Cut-Out Co. v. Milton Bradley Co., 289 Mass. 277, 194 N.E. 80.

■ Appellant further argues that Scientific is not entitled to use the trade secrets that may constitute *patentable* contributions to the "Aerofloat" line prior to the *issuance* of letters patent on the applications. We find this claim without merit and for two reasons. First, we have previously affirmed the findings of the trial court that no exclusive trade secrets of Gladding are involved, and therefore Scientific should enjoy their use as well as Gladding. Furthermore, Article 10 of the contract does not so limit the rights of Scientific to such secrets. It is not necessary for the validity of a licensing agreement that letters patent be first

issued. Hamilton v. Park & McKay Co., 112 Mich. 138, 70 N.W. 436; Burton v. Burton Stock-Car Co., 171 Mass. 437, 50 N.E. 1029; Brush Electric Company v. California Electric Light Company, 9 Cir., 52 F. 945; St. Louis Street Flushing Mach. Co. v. Sanitary Street F. M. Co., 8 Cir., 178 F. 923.

■ Article 10 speaks of Scientific's furnishing Gladding a copy of any patent *application* and Gladding having "the first refusal of exclusive rights thereunder." Clearly this implies that the rights are in the *application* and any resulting patent, but it does not mean that a patent must first issue.

Other contentions raised by appellant as to the identity of the inventor of the variable die application and bubble line application, we hold that we need not consider.

Finally appellant argues that Scientific should not be entitled to describe, in its bubble line application, the unpatentable contributions to the "Aerofloat" line development solely in support of an effort to obtain patent protection on the use of a blowing agent which is a separate and subsidiary feature not included in the "Aerofloat" line development. Gladding argues that claims 1 and 2 of the bubble line application are such that they will not be allowed by the Patent Office and thus only claims 3 to 8 will remain. Gladding says claims 3 to 8 are directed to the use of a blowing agent, which is a commercially worthless idea that has been abandoned by Scientific itself. But Gladding argues that the issuance of such a limited patent, even if granted, would effectively destroy some of the most valuable trade secrets relating to primer and plastisol coating and the process of applying the line coating, and thus make them available for use by competitors of Gladding. The District Court did not consider this aspect of the case, although the point was raised in appellant's complaint.

As previously said, we are of the opinion that the unpatentable secrets are not solely owned by Gladding but are joint

trade secrets of the parties. But even if they are joint trade secrets, they are still entitled to protection against unlawful and unreasonable disclosure. See Baldwin v. Von Micheroux, 5 Misc. 386, 25 N.Y.S. 857. We are of the opinion that the trial judge should consider this aspect of the case and determine whether or not Scientific is unlawfully and unreasonably describing these secrets in the bubble line application. If Scientific is guilty of such conduct, then it should be enjoined.

Based on what we have heretofore said, the judgment is reversed and the cause is remanded to the District Court for appropriate action in accordance with this opinion. It appears that the proposed licensing agreement drawn by Gladding and enclosed in a letter to Scientific dated April 23, 1956, will be a proper licensing agreement.[4]

Article 14 of the proposed licensing agreement dealing with a minimum royalty amounting to $3,500 can be eliminated at the option of Gladding if Gladding wishes to substitute the "anti-shelving" or "substantial use" provision previously suggested.

We add that the royalty should not be held to commence only upon the granting of a patent under the applications. In the licensing agreement submitted by Gladding to Scientific on April 23, 1956, Gladding agreed to pay royalties from and after July 8, 1955. Gladding now argues that this was an erroneous concession on its part, and the royalties should start to accrue only when patents are issued. We hold that under the original contract it was contemplated that royalties were to be paid when the exclusive license was granted, regardless of whether or not a patent had been actually granted or issued. Hamilton v. Park &

McKay Co., 112 Mich. 138, 70 N.W. 436; Burton v. Burton Stock-Car Co., 171 Mass. 437, 50 N.E. 1029. The royalties should commence upon the grant to Gladding by Scientific of an exclusive license. An accounting should be had to determine an award to Gladding for damages caused by reason of Scientific's manufacture and sale of its "Air Cel" line in competition with Gladding's "Aerofloat" line. Gladding is to recover the $2,000 bond deposited in the District Court in connection with the preliminary injunction originally granted by the District Court; the $250 bond in connection with this appeal; reasonable attorney's fees and costs.

Judgment reversed and remanded.

---

. 4. Scientific, by letter dated April 25, 1956, agreed to this licensing agreement if Article 16 were eliminated and Article 14 were amended. Article 16 of the proposed license provided that if Gladding later lost the exclusive license for any reason whatsoever Gladding would still have and possess a non-exclusive royalty free license. Scientific wanted Article 14 amended so that Gladding would have to pay a minimum royalty of $12,500, and if Gladding did not pay this amount, then Scientific could terminate the exclusive license, and Gladding would have no license at all. Both of these changes we have held to be unreasonable and unenforceable on Gladding.