McDonald's System, Inc., an Illinois Corporation, Plaintiff-Appellant, v. Sandy's Inc., an Illinois Corporation, McDonald's of Champaign-Urbana, Inc., an Illinois Corporation, C. Paul White, Jr., et al., Defendants-Appellees.

Gen. No. 11,698.

Second District, First Division.

December 31, 1963.

Cassidy & Cassidy, of Peoria (John E. Cassidy, Sr., Edwin A. Rothschild and Shelby Yastrow, of counsel),

and Sonnenschein, Levinson, Carlin, Nath & Rosenthal, all of Chicago, for appellant.

Albert E. Jenner, Jr., Philip W. Tone, Kenneth J. Burns, Jr., of Chicago, and Lyle W. Allen, of Peoria (Thompson, Raymond, Mayer & Jenner, and Heyl, Royster, Voelker & Allen, of counsel), for appellees.

DOVE, J.

The contract upon which this action is based, recites that McDonald's Self-Service System, Inc. is a California corporation and the originator and creator of a self-service drive-in food establishment system, generally known and referred to as "McDonald's Speedee System"; that this system includes special design of building, equipment layout, food formulas for hamburgers, cheeseburgers, malts, soft drinks, and french fries, and a chart method of inventory, schedule of business practices, and policies. The contract further recites that this McDonald's Self-Service System is the sole and exclusive owner of all proprietary and other property rights and interests in and to, "the tradename or trademark, McDonald's Hamburgers," and the trademark, "I'm Speedee," and that said system is being adopted, used and widely advertised in the United States. It then states that McDonald's System, Inc. is an Illinois corporation, and had obtained from the California Corporation, by license agreement, the exclusive right to license others throughout the United States, in the adoption and use of said system and said tradename and said trademark.

This agreement is dated December 16, 1955, and in it the plaintiff herein, McDonald's System, Inc. of 221 North LaSalle Street, Chicago, Illinois, is referred to as First Party and McDonald's of Champaign-Urbana, Inc. an Illinois Corporation is referred to as Second

Party. This agreement includes the following provisions:

"1. First Party hereby gives and grants to Second Party and Second Party hereby accepts for the period and upon and subject to the terms, conditions, and limitations hereinafter set forth and contained, the right, license and privilege to (a) Adopt and use the aforementioned system at the location specified in the premises hereof and in connection therewith to indicate to the public that Second Party is a licensee of "McDonald's Speedee System", and (b) Adopt and use the said tradename and/or trademark "McDonald's Hamburgers" and the said trademark "I'm Speedee" in connection with the said operation and the products sold and dispensed thereat, and (c) Send, at any time within six (6) months from and after date hereof, not more than two (2) persons to a McDonald's Speedee System drive-in food establishment (as shall be designated by First Party) for training for a period of one (1) week under the general supervision of First Party in the recommended procedures and practices of the said system, provided however, that any and all traveling, living and other expenses and/or compensation of the said trainee shall be fully paid and defrayed by Second Party and shall be at no cost or expense whatsoever to First Party.

"2. Second Party does hereby acknowledge that the grant of this franchise and license is the sole and only consideration for the payment of the sum of $950.00 paid by Second Party to First Party concurrently with the execution of this agreement, and that said sum shall have been fully earned by First Party upon the execution and delivery hereof.

"3. First Party does herewith, furnish and loan to Second Party, receipt of which is hereby acknowledged by Second Party, each of the following: (a) Set of blue print plans for the construction of the aforementioned special design building, the exterior appearance of which is more particularly set forth and delineated upon the drawing attached as Exhibit 'A' hereto, and hereby made a part hereof; (b) Copy of the aforementioned equipment layout; (c) Copy of the aforementioned formula for hamburgers, cheeseburgers, malts, soft drinks, and french fries; (d) Copy of the aforementioned chart method of inventory; (e) Copy of the aforementioned list of business practices and policies; and (f) First Party, at its sole cost and expense shall furnish one experienced person to assist the Second Party in establishing the said system for a period of one (48-hour) week at any time during the first four weeks of actual operation of said establishment by Second Party hereunder.

"4. Second Party acknowledges that, subject only to the license hereinabove given and received, McDonald's Self-Service System, Inc., is the owner of all proprietary rights in and to the said system and each and every part thereof, and the said tradename and trademarks together with the good will now and hereafter thereto attached; that the material and information now and hereafter provided and/or revealed to Second Party under and pursuant to this agreement constitute trade secrets of McDonald's Self-Service System, Inc., revealed in confidence hereunder, and that no right is given or acquired to use or duplicate this system or any portion thereof elsewhere than at the location specified in the premises hereof. Second Party covenants and agrees to keep and

60

respect the confidence hereunder reposed and Second Party covenants and agrees to return to First Party, upon the completion of the building and the installation of the equipment, the set of building plans and the equipment layout plan furnished and loaned by First Party to Second Party in accordance with Paragraph 3 above.

"5. Second Party understands and acknowledges that each and every detail of said system is most important and advantageous, not only to First Party and its aforenamed licensor, but also to its licensees, including Second Party as one thereof, and that full compliance and conformance therewith by all licensees is essential to best preserve, maintain and enhance the reputation, trade demand and good will built up for the said system, the establishments adopting and using the same, the products sold and dispensed therefrom, and the aforementioned tradename and trademarks used in conjunction therewith.

"6. The franchise and license granted to Second Party hereunder is granted by First Party, and accepted by Second Party, upon and subject to the following express terms and conditions:

(a) Unless otherwise consented to by First Party in writing, the drive-in establishment to be constructed by Second Party hereunder shall be completed within 180 days from date hereof and shall be, and shall remain through the effective term of franchise and license, a building constructed and equipped in accordance with the building blueprints and equipment layout plan furnished in accordance with Paragraph 3 hereof, and surrounded by a macadamized parking lot the dimensions of which shall be not less than 100 X 125 feet. Second Party shall install and use at the said establishment only such equipment

and fixtures as shall conform to standards of quality and utility approved by First Party. The said parking area shall be maintained by Second Party at all times as a parking area for the exclusive use of Second Party and the customers of Second Party in the conduct of the enterprise herein contemplated, namely the operation of a specialized retail drive-in food establishment. Said establishment (building, equipment, and parking area) shall be kept and maintained at all times by Second Party in good condition and repair and in appearance clean and neat.

(b) All employees of Second Party, while engaged in the operation of said establishment, shall wear uniforms conforming in color and design to such specifications as First Party from time to time may designate for use of other franchise holders and licensees; and said employees shall at all times during said employment present a neat and clean appearance and render competent, sober and courteous service to the patrons of said establishment; and there shall be used in the dispensing and sale of products therefrom only such containers, cartons, sacks, napkins, spoons, flavorings and garnishments as shall comply with the specifications and standards prescribed by First Party from time to time; and there shall be used in the dispensing and sale of said products such, and only such, signs, cards, notices, displays or decorations as shall be supplied or approved by First Party.

(c) For and during the effective term of this franchise and license, Second Party is not to dispense, sell or offer to sell at the said establishment, under the aforementioned tradename and trademarks or otherwise, any item or product that does not conform to such standards and specifica-

tions of proportion, appearance, quality, coloring, flavoring, and/or other ingredients or characteristics as from time to time may be prescribed by First Party and furnished in writing to Second Party.

(d) Second Party, at his own cost and expense, shall cause to be constructed, erected and maintained at all times while operating under this franchise and license, signs upon the said building and neon sign in said parking area conforming to the appearance and construction provided for and delineated in the designs appended as Exhibit 'A' hereto and the detailed plans and sketches of which are furnished to Second Party by First Party concurrently herewith. All advertising matter shall be submitted to and approved by First Party prior to publication.

(e) Second Party shall comply with all Federal, State, County and City laws, ordinances and regulations affecting directly or indirectly the operation of the said food establishment.

(f) The said food establishment shall be open for business to the public at least twelve (12) hours per day and not less than 300 days during each year of the term of this agreement.

(g) First Party shall have the right to inspect the said establishment and Second Party's operations hereunder at all reasonable times to determine the extent of Second Party's compliance hereunder.

"7. Nothing herein contained shall be construed to vest in Second Party any right, title or interest in and to the aforementioned tradename or trademarks or the good will now or hereafter thereto attached, other than the right and license to use said tradename and trademarks pursuant to the terms and conditions and during the effec-

tive term of the franchise and license granted hereunder.

"8. During the effective terms of this franchise and license, First Party will not grant to any individual, association, firm, or corporation any franchise or license to construct, maintain, or operate a similar establishment and/or to adopt or use the aforementioned tradename and/or trademarks in that certain area surrounding the aforesaid location of Second Party, more particularly described as follows: Champaign County including Champaign, Urbana, and Rantoul, Illinois. N. E. Corner of Route 45 and is known as 5 Points. During the effective term of this agreement, Second Party shall not, except with the consent of First Party, engage in any business the same as or similar to the business covered by this agreement at any place other than the premises heretofore described in the State in which said premises are located or at any place in a state contiguous to said State; and Second Party shall not employ nor seek to employ any person who is at the time employed by the First Party or by any person who is at the time operating a similar establishment under license from First Party and Second Party shall not, directly or indirectly, induce any such person to leave his or her employment as aforesaid.

"9. For and during the term of this agreement Second Party shall pay semi-monthly to First Party as license royalties, one and nine-tenths per cent (1.9) of the gross receipts which Second Party shall receive from the operation of said establishment. On the first (1st) and sixteenth (16th) day of each calendar month, Second Party shall render to First Party a full and complete statement, in such form as First Party shall re-

64

quire, of all receipts from the operations of said establishment for the preceding semi-monthly period and to thereupon pay to First Party the percentage of gross receipts from the operation of said establishment for said period as hereinabove set forth."

The contract then defined gross receipts, as used in the agreement and provided that all accounts, books, records, and tax returns of Second Party, pertaining to the business, should be open for inspection by First Party at all reasonable times; that First Party would keep Second Party advised of any new developments and improvements in the system, and of all purchasing advantages enjoyed in common by other licensees. The contract then obligated Second Party to procure, at its expense, public liability insurance of all kinds, in amounts, and in companies, determined and approved by First Party.

The Thirteenth Paragraph of this agreement provided that if Second Party at any time desired to discontinue to do business as provided in the license agreement, it could do so, and surrender its rights under the agreement upon sixty days written notice to First Party. It was then provided that the agreement, franchise, and license, unless theretofore terminated, shall remain in force for ten years, with an option to Second Party to renew it for an additional period of not less than five or more than ten years. It was further provided that upon the termination of the franchise and license, Second Party would discontinue the use of all printed goods bearing the tradename and would not permit the establishment to be used for a similar business for a period of two years.

This agreement designated "McDonald's of Champaign-Urbana, Inc." as Second Party, but it was signed by Messrs. White, Wenger, Lundberg, and Davidson, as individuals. The corporation, McDonald's of

Champaign-Urbana, Inc. was not organized until March 15, 1956. All the parties to said agreement, however, understood that the named Second Party was the corporation, which Messrs. White, Wenger, Lundberg, and Davidson organized on March 15, 1956, and not the individuals who signed the agreement, and the parties thereto, at all times thereafter, so treated it, and in this opinion we treat the Second Party to this franchise and license agreement as "Mc-Donald's of Champaign-Urbana, Inc."

Following the execution of this agreement, Messrs. White, Wenger, Lundberg, and Davidson leased the premises in Urbana, known as "5 Points" and located at the northeast corner of Route 45, as a site for the McDonald Restaurant, which they were authorized to operate under the franchise and agreement of December 16, 1955.

In June, 1956, this McDonald Restaurant opened for business and has continued in operation since that time. It is a successful and well-managed McDonald's Restaurant, and is paying royalties to appellant under the December 16, 1955, agreement.

Under date of January 8, 1958, Messrs. White, Wenger, and Lundberg entered into a lease with Leon Sutherland for a site for a McDonald drive-in restaurant on North Sheridan Road in Peoria, Illinois. Prior to the execution of this lease, the lessees sought to obtain a McDonald franchise, but were unable to procure one, as plaintiff had promised such a franchise to another. In February, 1958, Messrs. White, Wenger and Lundberg organized "Sandy's Inc.," an Illinois corporation. The capital stock of which was subscribed by the spouses of Messrs. White, Wenger and Lundberg. Upon the leased premises on North Sheridan Road in Peoria, Sandy's Inc. erected a drive-in restaurant of substantially the same design and dimensions as the one operated by McDonald's of Cham-

paign-Urbana, Inc. in Urbana. On August 8, 1958, Sandy's Inc. opened for business in Peoria.

The instant complaint, which was filed on October 2, 1958, by McDonald's System, Inc., the First Party under the agreement of December 16, 1955, alleged that the individual defendants, Messrs. White, Wenger, Lundberg, and Davidson, and the corporate defendant, McDonald's of Champaign-Urbana, Inc. breached the agreement of December 16, 1955, by engaging in a similar business under the name of Sandy's Inc. in Peoria, and by duplicating and using at the Peoria location the material and information franchised to them under the agreement of December 16, 1955. The pleader concluded that as a result of these breaches, the defendants have forfeited all their rights under this agreement. The relief which plaintiff sought was a finding to this effect and for a decree that the agreement of December 16, 1955 be terminated, and that plaintiff has suffered damages to its rights of property, and that compensatory and exemplary damages be awarded plaintiff.

The other relief sought by plaintiff is that defendant, Sandy's Inc. be enjoined from continuing to use the system of McDonald's Self-Service System, Inc., and the material and information and trade secrets thereof, and for an accounting of the proceeds derived by this defendant as a result of its illegal use of plaintiff's property right in this respect.

All the defendants filed an answer to the complaint and additional defenses. The individual defendants filed a counterclaim. The issues raised by the counterclaim and reply are pending and undisposed of in the trial court, and are not involved in this appeal, and no question arises on the pleadings. The cause was referred to a Special Master, who heard the evidence and reported his conclusions of law and fact. Upon a hearing before the Chancellor, all exceptions to the

67

Special Master's report were overruled and a decree entered confirming the report and conclusions of the Special Master and dismissing the complaint for want of equity. To reverse this decree, plaintiff appeals.

Among the separate 103 findings of fact covering 24 pages of the printed abstract of a record which consists of 3174 typewritten pages, the Special Master found that the corporate purpose of Sandy's Inc., as reflected in its Corporate Charter, is a verbatim copy of the stated corporate purpose of McDonald's of Champaign-Urbana, Inc.; that the menu of Sandy's Inc., and the equipment, the placing of the equipment, the method of procedure of the preparation and service of all foods and drinks and the wrapping and packaging of foods are substantially identical to the McDonald Restaurant operated by defendants at Urbana.

The Special Master also found that the equipment, equipment lay-outs, and equipment assembly of the McDonald Urbana drive-in restaurant and Sandy's drive-in restaurant can be substantially duplicated by the purchase of stock items of equipment from various manufacturers; that they are generally known in the restaurant industry and contain no features which are secret, novel, or unique; that the methods of food service and food preparation employed by appellant are all generally known to the trade and involve no features which are secret, novel, or unique; that the various food products are generally available and used in the restaurant trade; that the equipment, menu, food preparation and food service methods, and all other aspects of operation of these two restaurants are well known to the trade generally and are in common use by thousands of self-service drive-in restaurants throughout the United States, and have been repeatedly published in the various trade publications, and are subjects of numerous articles and advertise-

68

ments in these publications; that they are described and pictured in a published book, the "Drive-in Operator's Manual," which is circulated and available to the restaurant trade; that the self-service feature of the McDonald restaurants, which involves the walking up to a window by a customer, making a purchase, and carrying food away, has been in use at hot-dog stands and similar food establishments for many years prior to the opening of the first McDonald restaurant, and that appellant did not furnish appellees any trade secrets, or characterize, as secret and confidential, any communication to appellees in any aspect concerning the operation of its restaurant.

The Special Master concluded that Sandy's Inc., located at Peoria, is outside the trade area of McDonald's store, located in Urbana; that the matters revealed by plaintiff to defendants, under the Franchise Agreement, were not trade secrets; that the portion of the Franchise Agreement which defined the trade area as the State of Illinois and surrounding contiguous states was void and unenforceable as an unnecessary and unlawful restraint of trade. The Special Master further found that none of the defendants had violated the terms and provisions of paragraph eight of the Franchise Agreement.

In approving these findings of the Special Master and in dismissing the complaint, the Chancellor held that the provisions of the Franchise Agreement which restricted appellees from engaging in any such business other than at the Urbana-Champaign location were in restraint of trade; that defendants had not breached any of the valid provisions of the Franchise Agreement and were not entitled to any relief.

Prior to the date of this agreement on December 16, 1955, the evidence discloses that defendants, Messrs. White, Wenger, and Lundberg, had no experience in the wholesale or retail food business or in

the erection, management or operation of a drive-in restaurant or hamburger stand. They sought appellant and obtained from it a franchise to operate a McDonald's restaurant in Urbana, and executed an instrument which legally obligated the parties thereto to abide by and perform its several conditions. The instrument recited, among other things, that appellant furnished operational and management guides and procedures, including blueprints, plans, and specifications, and also formulas for food preparation and quality control, advertising assistance, equipment maintenance, current literature in the industry, accounting methods, market research results, and employees' training for a self-service, drive-in restaurant.

Appellees used the blueprints, plans and specifications furnished by appellant, built the Urbana restaurant in accordance thereto, and appropriated the tradename "McDonald's Hamburgers" and the trademark, "I'm Speedee." The evidence is that appellant has assisted and advised appellees in virtually every detail in connection with operation and management of the Urbana restaurant and appellees recognized their obligations under the Franchise Agreement and have paid, and are paying, royalties to appellant as in the agreement provided.

This Franchise Agreement of December 16, 1955, provides, among other things, that "the material and information now and hereafter provided and/or revealed to Second Party under and pursuant to this agreement, constitute trade secrets of McDonald's Self-Service System, Inc., revealed in confidence hereunder, and that no right is given or acquired to use or duplicate this system, or any portion thereof, elsewhere than at the location specified."

Appellees, by executing this agreement, recognized that they acquired no right to use or duplicate this system, or any portion thereof at any location other

than at the Urbana restaurant. Almost three years after the execution of the Franchise Agreement, appellees substantially duplicated the Urbana restaurant by erecting at Peoria another such restaurant, which they opened for business on August 8, 1958.

Counsel for appellees, in excuse for so doing, argue that the material and information received by them under the Franchise Agreement, was generally known and used in the restaurant trade; that appellant acted in bad faith by representing that it had trade secrets to disclose to appellees when in fact its lay-out, operating method, and so-called "system" were of public knowledge and common use throughout the restaurant trade, and that there were, in fact, no trade secrets communicated to appellees, and therefore, they had a perfect right to use the information they did in the construction and operation of Sandy's Inc., at Peoria.

Perhaps much of the information which appellees received from appellant following the execution of the Franchise Agreement, and appellant's plan, lay-out, and specifications may have been secured elsewhere than from appellant. Messrs. White, Wenger, and Lundberg, however, used that plan and built the Urbana restaurant in accordance with the specifications received from appellant, and have operated the Urbana restaurant as directed by appellant; that appellees could have obtained the data and information elsewhere is of no significance.

The Franchise described in the agreement of December 16, 1955, was a valuable property right and so recognized by appellees and when they established and operated a drive-in based upon the knowledge and know-how which appellees acquired from appellant, they violated the provisions of the contract which they had voluntarily executed. The evidence is, and the Special Master so found, that Sandy's Inc., is a duplication, in construction and operation, of McDon-

ald's in Urbana. The only difference is that the Urbana restaurant uses the name "McDonald's" while the Peoria restaurant is indicated by the name "Sandy's Inc."

From the time the Urbana McDonald store opened in June, 1956, appellant has suggested the price at which its franchisee should sell its products and recommended that sales be had at these suggested prices. Appellant also recommended the purchase of supplies from designated suppliers, and appellees complied with these suggestions and recommendations, with the exception that during 1957 the Urbana McDonald's store sold a cup of hot chocolate for three cents a cup more than appellant's suggested price, and on an occasion purchased chocolate syrup from a source other than that specified by appellant.

All the evidence is, and the Special Master so found, that the menu of Sandy's Inc., the prices of the foods sold at Sandy's Inc., the equipment in Sandy's Inc., with respect to sign, capacity, function, and in many cases, the manufacturer and the relative placement of the equipment, are all virtually identical in the McDonald drive-in at Urbana and Sandy's Inc., in Peoria; that the method used for the preparation and serving of hamburgers, cheeseburgers, french-fried potatoes, milk shakes, soft drinks, chocolate and coffee, and the procedures used for wrapping, packaging, and serving food to the public at Sandy's Inc., is identical to that used in the McDonald Urbana drive-in, and the two restaurants are in every respect substantially identical.

The Special Master specifically found that none of the defendants violated paragraph eight of the Franchise Agreement. This paragraph specifically obligated appellees not to "employ any person, who is, at that time, operating a similar establishment under license from First Party." The evidence is that Jack Genster

72

was manager of the Urbana restaurant from the time it opened until January 1957. He was succeeded by Kenneth Andris, who served as manager until July, 1958, at which time, upon the opening of Sandy's Inc., in Peoria, he, Andris, took over the management of Sandy's Inc., at Peoria. This conduct on the part of appellees is inexcusable in view of its contractual relationship with appellant.

Among the provisions contained in said paragraph eight of the Franchise Agreement, which the Special Master found had not been violated, was: "During the effective term of this agreement, Second Party shall not, except with the consent of First Party, engage in any business the same as, or similar to, the business covered by this agreement at any place other than the premises heretofore described in the state in which said premises are located or at any place in a state contiguous to said state."

Paragraph 13 of the Franchise Agreement provided that if appellees desired to discontinue to do business at the Urbana-Champaign location, they could do so by cancelling the agreement, which could be done by giving a sixty-day notice.

In Harrison v. Glucose Sugar Refining Company, 116 Fed 304, there was involved a contract under which Harrison agreed to accept employment for five years and obligated himself not to work for any Glucose manufacturer other than the plaintiff within a fifteen-hundred-mile radius of Chicago. The contract was dated August 14, 1897, and on June 8, 1900, Harrison abandoned his contract and left the service of his employer. Thereafter his employer, the Glucose Sugar Refining Company, brought suit against Harrison to restrain him from violating the provisions of his contract. In affirming the decree of the Circuit Court for the Northern District of Illinois, which granted the relief sought by the employer, the Circuit Court of

Appeals for the Seventh Circuit said that in the contract in question the restraint is limited, as to time, to the period of service engaged for; as to territory, within a radius of 1500 miles of the City of Chicago. It is contended that in the latter respect the restraint was unreasonable. In answering this contention the court said that the restriction that during his term of service, Harrison should not become interested in the manufacture of products like those manufactured and sold by his employer in the territory where his employer did business did not seem unreasonable. The court then continued (p 310):

> "Here the restriction is limited to the period of service engaged for. The appellant left without cause and to enter the service of a rival. There was no acquiescence by appellee. . . . Clearly, under such circumstances, no public policy would be violated in upholding the covenant. He is not deprived of the opportunity to obtain the means of subsistence or of giving to the public the benefit of his skill in the business to which he has been accustomed. He has only to perform the duty which he engaged to perform to render himself and his family comfortable. We know of no public policy which requires us to sanction the bald violation of a contract lest the public should be deprived of the peculiar skill of the appellant because he will not exercise that skill where he has engaged to exercise it."

In Saul v. Thalis, 156 F Supp 408, one of the covenants in the agreement prohibited the employee from "engaging in a competing business" during the period of employment. The United States District Court for the District of Columbia held that such a covenant could not be questioned so long as the employee remained in the employ of his employer, but that such

74

covenant could not legally survive after the employer-employee relationship ceased. In so holding the court said (p 411):

"... this case involves an agreement of employment for a fixed term containing a covenant which restricts the employee from engaging in a competing business during the term of employment fixed by the agreement. The validity of such covenant cannot be questioned so long as the employee remains in the employ of the employer."

In Good v. Modern Globe, Inc., 346 Mich 602, 78 NW 2d 199, it appeared that the plaintiff, Good, was employed as a consultant. His contract required him to "hold himself available for consultation," and he was prohibited by the terms of the agreement from working for competitors during the period of his contract. This covenant was sustained as being legal and valid.

Under these and other authorities the extent of the territorial restriction is a factor which affects the validity of a post-term covenant only. In the instant case the covenant is an in-term, not a post-term, covenant, and as long as appellees seek to avail themselves of the beneficial provisions of their franchise contract, they should not be permitted to disregard or refuse to abide by the several obligations they assumed. The contract was not of unlimited duration, and when the franchise term is ended, either by cancellation, or by the expiration of time, appellees are free to engage in similar business elsewhere without any franchise. There is nothing illegal in such an agreement, and the obligations of the respective parties should be respected and enforced.

The record conclusively shows that appellees violated not only their covenant not to engage in a similar business during the franchise term of their agreement

75

with appellant, but also appellees violated the agreement which prohibited them from duplicating the McDonald system, or use it, except at the franchised location.

The decree appealed from is reversed and this cause is remanded to the Circuit Court of Peoria County, with directions to enter a decree in accordance with the views herein expressed.

Decree reversed and cause remanded with directions.

McNEAL, P. J. and SMITH, J., concur.