The Vendo Company, a Foreign Corporation, Plaintiff-Appellee, v. Harry B. Stoner and Stoner Investments, Inc., a Foreign Corporation, Defendants-Appellants.

Gen. No. 68–1.

Second Judicial District.

January 30, 1969.

Rehearing denied March 24, 1969.

Sidley & Austin, Boodell, Sears, Sugrue & Crowley, of Chicago (Barnabas F. Sears and Gerald M. Sheridan, Jr., of counsel), for appellants.

Reid, Ochsenschlager, Murphy and Hupp, of Aurora (Stephen J. Mrkvicka, of counsel), for appellee.

MR. JUSTICE SEIDENFELD delivered the opinion of the court.

Defendants, Harry B. Stoner and Stoner Investments, Inc., appeal from judgments in a suit for breach of a sales and employment contract and for injunctive relief, heard without a jury.

Judgment was entered in favor of the plaintiff and against the defendants as follows: (1) against Harry B.

Stoner in the amount of $250,000; (2) against Harry B. Stoner and Stoner Investments, Inc., in the amount of $1,100,000; (3) against Harry B. Stoner, restraining him from "engaging, directly or indirectly, in the vending machine manufacturing business, individually or as a partner, employee or agent, anywhere in the United States or in any foreign country in which the Vendo Company engaged in such business (as of June 1, 1959), until June 1, 1969; and (4) against Stoner Investments, Inc., restraining it in similar terms."

A question is also raised on the pleadings, arising out of the court's order striking certain defenses and counterclaims based upon the Federal and State Antitrust laws.

In April, 1959, the defendant corporation was principally engaged in the business of manufacturing and selling candy vending machines throughout the United States, and was about to license a company to sell its machines in England. This corporation will herein be referred to as Stoner Investments, its present name, notwithstanding that it was named Stoner Mfg. Corp. in 1959. The corporate shares of Stoner Investments were owned in 1959 by defendant Harry B. Stoner, his wife, his mother and his sister-in-law, Ruth Netrey. Mr. Stoner was, without dispute, the principal officer and in control of the management of the corporation.

The Vendo Company, in 1959, had been one of the leading manufacturers and sellers of vending machines for hot and cold beverages, ice cream and certain other products. The company did not manufacture or sell vending machines for candy, cigarettes, hot sandwiches and instant coffee and tea at that time, but such machines had been considered and were in various stages of research and development. Vendo machines were then being sold in 58 countries in every continent. Clearly, Vendo was a considerably larger and more diversified company than Stoner Investments.

On April 3, 1959, a contract was executed by which Vendo agreed to purchase Stoner Investments' assets, excluding real estate and improvements thereon, cash on hand or on deposit, and receivables. In essence, Vendo was to pay $3,400,000 in cash, subject to certain adjustments, deliver 60,000 shares of its fully paid and nonassessable common stock, pay a portion of its profits in excess of $250,000 in any calendar year from the assets being purchased for a period of ten years, pay 25% of monies received from sales outside the United States of Stoner Investments' products, also for a period of ten years, assume responsibility for the collection of accounts receivable, and pay all debts, obligations and liabilities of Stoner Investments. The sales agreement imposed the following restriction on the selling corporation:

> "Section 15. From and after the closing, the Company [Stoner Investments] will not own, directly or indirectly, manage, operate, join, control or participate in the ownership, management, operation or control of, or be connected in any manner with, any business engaged in the manufacture and sale of vending machines under any name similar to the Company's present name, and, for a period of ten (10) years after the closing, the Company will not in any manner, directly or indirectly, enter into or engage in the United States or any foreign country in which Vendo or any affiliate or subsidiary is so engaged, in the manufacture and sale of vending machines or any business similar to that now being conducted by the Company."

In addition to the sales agreement, an employment contract was executed whereby Mr. Stoner would serve Vendo in an executive capacity for five years, or until June 1, 1964, at an annual salary of $50,000. This agreement also contained a noncompetition clause which reads as follows:

"5. During the term of this agreement and for a period of five (5) years following the termination of his employment hereunder, whether by lapse of time or by termination as hereinafter provided, Stoner shall not directly or indirectly, in any of the territories in which the Company or its subsidiaries or affiliates is at present conducting business and also in territories which Stoner knows the Company or its subsidiaries or affiliates intends to extend and carry on business by expansion of present activities, enter into or engage in the vending machine manufacturing business or any branch thereof, either as an individual on his own account, or as a partner or joint venturer, or as an employee, agent or salesman for any person, firm or corporation or as an officer or director of a corporation or otherwise, provided however that the Company, its subsidiaries and affiliates shall be excluded from the restrictions hereof and provided also that Stoner shall be permitted to own, hold, acquire and dispose of stocks and other securities which are traded in the investment security market whether on listed exchanges or over the counter."

The employment contract provided that Mr. Stoner "shall regulate his own hours of employment and shall determine the amount of time and effort which he shall devote" to Vendo, and that the value of his services are not to be measured by the time and effort he devotes to the business, but by his advice, counsel, know-how and experience. The contract further provided, inter alia, that Vendo "shall have the right to terminate this agreement upon thirty (30) days' notice in the event of the substantial violation of the terms hereof by Stoner."

There was evidence offered to show that Mr. Stoner, after the signing of the sales agreement but before the closing of the transaction, had second thoughts about the wisdom of the sale. He made statements to this effect

268

to the business representative of the union for the plant's employees, intimating at the time that many of the employees would be losing their jobs and that equipment was being moved out of the plant. It does not appear that the union took any action—other than to investigate—as a result of these conversations.

Almost immediately after the take-over by Vendo, several points of friction developed between Mr. Stoner and certain of Vendo's other executives. Essentially, Mr. Stoner complained that his services were not being utilized, that he was being treated as nothing more than a "figurehead," and that the procedures and employees of Vendo were ineffectual.

For several years prior to the sale to Vendo, R. W. Phillips (Rod) had been the Stoner plant superintendent, and his son, William Phillips (Bill), had been assistant superintendent. Rod was liaison engineer between the engineering and production departments, and participated in design work on a day-to-day basis. Bill had a degree in aeronautical engineering and Navy training in electronics.

Bill resigned from Vendo in June or July of 1960, ostensibly because he was no longer in line to become the plant manager, and because he purportedly disagreed with Vendo's philosophy and attitude concerning product quality. Within two months of his resignation, Bill met with Mr. Stoner and proposed that the latter finance the development by Bill of an electronic coin detecting device which he had conceived, and which would be of considerable value in the vending machine as well as in other industries. That discussion concluded with the agreement that Stoner Investments would pay Bill a salary of $650 per month to develop such a device, and any patents thereon would belong to Stoner Investments. Bill's father, Rod Phillips, was present at the time of this conversation.

Working primarily in his basement at home, Bill nearly completed the coin detector by the end of 1960. A patent

was issued in October of 1961, and was assigned to Stoner Investments. Except for a "breadboard" model, the coin detector was never produced. Bill received a total of $3,250 as salary from Stoner Investments for his work on the coin detector, and in addition was reimbursed nearly $1,000 for expenses.

Rod Phillips also resigned from Vendo in mid-1960, at about the same time as Bill resigned. Rod's stated reason for leaving was that he resented "spying" on the progress of another company which manufactured slug-rejectors. Rod spent approximately six months after his resignation in retirement, and it was during this period of time that his son, Bill, was designing the electronic coin detector with the financial aid of Stoner Investments.

In late 1960 or early 1961, when Bill's design of the coin detector was virtually completed, Rod approached Mr. Stoner with the request that Stoner provide sufficient funds to enable Rod to engineer and develop a particular type of vending machine. Mr. Stoner agreed to have Stoner Investments make noninterest bearing loans to Rod for that purpose. According to the testimony of defendants, neither Mr. Stoner nor Stoner Investments was to have any ownership or control in Rod's venture, it being their position that Rod was entitled to this consideration for his many years of loyal service to Stoner Investments. During 1961 and 1962, Stoner Investments loaned Rod Phillips a total of $206,000.

In addition to making the above loans to Rod, Mr. Stoner made available to Rod and Bill in early 1961 an old milk plant building known as the Middle Avenue Building. Rod was charged no rent, but made repairs to the building with materials purchased by Mr. Stoner.

In August of 1961, two other former employees of Stoner Investments—and then employees of Vendo—resigned from Vendo and joined Rod and Bill. Their combined salaries of $1,150 per month were paid by Stoner Investments until December of 1962. One of these men

had between fifteen and twenty years of design experience with Stoner Investments prior to the sale to Vendo, and the other had served as a toolmaker.

The vending machine developed by Rod and Bill Phillips was to be used for the vending of candy. There were three characteristics of this machine which contributed to its eventual popularity and acceptance, namely: (1) positive stock rotation, known as first-in first-out, or FIFO, where the first product stocked in the machine would be the first one sold, thus reducing the chance of vending or discarding stale candy; (2) continuous display through a window of the actual product next to be vended; and (3) capacity for stocking mixed products in a single conveyor, and consequent elimination of the usual necessity to sell out the product before restocking with a different product. Although machines having those features had been on the market for many years, none had incorporated all three of the above characteristics, and in fact no practical machine with all these characteristics had ever been developed previously.

It is one of Vendo's contentions herein that Mr. Stoner's financial participation in the development of this machine amounted to the appropriation of a trade secret of Vendo.

It is uncontroverted that Vendo, before the acquisition of the Stoner plant, had been taking steps with a view toward the development of a FIFO candy vending machine that incorporated a window displaying the actual product to be vended, and which would permit the stocking of mixed products in a single conveyor. The authority for an expenditure on such a project was first assigned by Vendo in December of 1958. This project led to the fabrication of two "developmental mechanisms." Neither of these models included the vend-the-bar-you-see window, although an artist's sketch of a complete machine, having such windows in front of each conveyor, was prepared. There was evidence to show that artist's

271

sketches of Vendo's contemplated machine were shown to Mr. Stoner and Rod and Bill Phillips in early June, 1959, almost immediately after Vendo's acquisition of the Stoner plant.

One of these models was exhibited at a products planning meeting at the Stoner plant on August 3, 1959, at which Mr. Stoner and Rod Phillips were present. At that meeting, the Stoner Division sales manager said the machine was deficient in three respects: (1) the product would have to be stocked upside down; (2) the machine could tip over during loading because all of the conveyors would have to be swung out; and (3) production of the machine would be unduly expensive. The minutes of that meeting stated that the Sales Department "feels the objectives of stock rotation and visual display are sound but the particular design in question is not acceptable because of loading and inventory problems." These minutes went on to state that Vendo's Research and Engineering Department "is to continue research as to how to basically improve the stock rotation idea so that it can be made practical."

In January, 1960, Vendo's Vice-President in charge of Research and Engineering made a handwritten notation on an interoffice memorandum, stating: "I agree on the need for rotation of stock, but not on [this] unit. I think a better one could be devised." Neither of these models was patented, and a Vendo executive had written patent counsel that "we do not intend to commercialize" these models. In September and October of 1960, Vendo sent both models to Vendo's "morgue" which, according to our reading of the record, is the destination for non-active—but not necessarily abandoned—projects.

The machine developed by Rod and Bill Phillips was called the Lektro-Vend machine, and while incorporating the three characteristics of first-in first-out, a vend-the-bar-you-see window, and mixed stock in a single conveyor, it differed in many basic respects from the models de-

272

veloped by Vendo. For example, the Lektro-Vend machine was electrically powered while Vendo's was to be mechanically powered; Vendo's machine required approximately 4,000 screws for the shelving mechanism, while the Lektro-Vend machine eliminated these by using a series of L-shaped shelves interconnected with pins; the conveyor in the Lektro-Vend machine moved in a track guided by plastic wheels, while Vendo's conveyor unitized bicycle chain affair with hooks; and the Lektro-Vend machine was loaded by tilting out the conveyor within the machine's center of gravity, thus avoiding the objectionable swing-out loading requirement of Vendo's machine. More significantly, the Lektro-Vend machine was functionally and economically successful, while many undesirable features of the Vendo machine rendered its production impractical.

The first prototypes of the Lektro-Vend machine were exhibited in October, 1962, at a trade show in San Francisco. This machine was accepted so well that another company took its own stock rotation (FIFO) machine off display. In fact, certain officers and directors of Vendo were so impressed with the machine that one of them approached Rod Phillips at the show and discussed the possiblity of Vendo purchasing the machine.

It appears that, prior to the show, Rod Phillips had intended to sell the Lektro-Vend design and tooling, but the industry's response to the machine led to Rod's and Bill's decision to manufacture and sell the machine themselves. After returning from the show, Rod discussed the response to his machine with Mr. Stoner, and invited Stoner to join with him in his plan to manufacture and sell the Lektro-Vend machine generally.

In December of 1962, immediately before the Vendo Board of Directors' meeting, Mr. Stoner told the Board Chairman that he, Stoner, would like a release from his employment contract, for the reason that he had an opportunity to invest in the Lektro-Vend machine and to

participate with Rod Phillips in its manufacture and sale. He was requested to submit his request in writing for the Board to consider. Mr. Stoner made no mention of his previous financial aid toward the development of the Lektro-Vend machine. In short, Mr. Stoner was told that with his capital and experiences, he would be a formidable competitor, and that part of the consideration for the sales and employment contracts was that Vendo would not be competing with Mr. Stoner or his company.

While his release from his contract was denied, he was requested to act on behalf of Vendo in looking into the purchase of the Lektro-Vend machine from the Phillipses. Stoner discussed the matter with Rod Phillips, and then arranged a meeting in January, 1963, which was attended by Stoner, Rod Phillips and certain of Vendo's officers. The Lektro-Vend machine was demonstrated and explained at that time, with Stoner taking no active part. Although price was not discussed at the meeting, Stoner later reported to Vendo that Rod Phillips was asking $1,500,000. Stoner testified that the Seeburg Corporation had shown an interest in purchasing the Lektro-Vend machine at that price.

Although Stoner recommended that Vendo purchase the machine, Vendo would not agree to pay such an amount. Instead, in March of 1963, in reply to an inquiry from Stoner, Vendo's Vice-President in charge of operations wrote that Vendo would only pay for out-of-pocket costs, "plus a fair profit to Rod and his associates; taking into consideration the amount of time, money and ingenuity which they had expended on the project, but that it was my feeling that this wouldn't add up to anything like $1,500,000."

Back in December, 1962, at about the time that Stoner was asking to be released from his employment contract with Vendo, his sister-in-law, Ruth Netrey, made a loan of $350,000 to Rod Phillips on his personal note bearing 4½% interest. Defendant's evidence is that

274

Stoner in no way persuaded or influenced Mrs. Netrey to make this loan, which within one year was increased to $525,000. Mrs. Netrey had been one of the shareholders of Stoner Investments at the time of the sale of assets to Vendo, but had since sold her stock in that corporation, as did Mr. Stoner's mother, leaving only Mr. Stoner and his wife as shareholders of the defendant corporation.

In March or April of 1963, Stoner Investments had completed the construction of a general purpose office and manufacturing building on Sullivan Road in Aurora, where it had owned 370 acres of vacant land. The original purpose for constructing this building was allegedly to enable Stoner to prefabricate homes in the winter and to start the development of an industrial park. Its first and only occupants, however, were Rod and Bill Phillips who used the building for the manufacture of the Lektro-Vend machine. There was evidence tending to show that Stoner and the Phillipses knew before the end of 1962 that the Sullivan Road Plant would be used by them for this purpose.

Admittedly, Mr. Stoner never advised Vendo until the Spring of 1963 as to his arrangements with Bill and Rod Phillips. He testified that while he made no attempt to conceal these arrangements, he did not regard them as being of consequence to Vendo.

The Lektro-Vend Corporation was organized on September 18, 1963, at which time its shareholders and the number of shares owned by each were as follows: Rod Phillips—2,875 shares; Glen Phillips—750 shares; Bill Phillips—1,125 shares; William Callahan (one of the former Stoner and Vendo employees who resigned from Vendo in August, 1961, and helped in the development of the Lektro-Vend machine)—250 shares; Ruth Netrey—5,000 shares.

On March 21, 1964, Stoner Investments contracted with Lektro-Vend Corporation to sell the Sullivan Road Plant

to the latter. To finance the purchase, Lektro-Vend made a 100% short-term loan from a Chicago bank, which the bank would do only upon Stoner Investments' guarantee to repurchase the property in the event of a default. The loan had since been extended on several occasions, with Lektro-Vend paying the interest thereon.

Mr. Stoner's employment contract with Vendo terminated by lapse of time on June 1, 1964, and was not renewed although Stoner was retained on Vendo's Board of Directors until the Spring of 1965. In that same month, Mr. Stoner's wife was issued 5,000 shares of stock in Lektro-Vend Corporation, and in the following month Mr. Stoner himself was issued an additional 5,000 shares. On June 30, 1964, Stoner made a personal loan of $100,000 to Lektro-Vend, and this was repaid in 1965 from the proceeds of a $185,000 loan to Lektro-Vend from Stoner Investments. During 1965 and 1966, a total of $402,000 was loaned to Lektro-Vend from Stoner Investments and Stoner Shopping Center, Inc., all evidenced by demand notes bearing 4½% interest.

In March, 1965, Lektro-Vend salesmen reported that Vendo's salesmen were circulating rumors to the effect that Lektro-Vend was about to go out of business. When this was reported to Stoner, he wrote a letter on Lektro-Vend stationery to fifty vending machine operators. This letter, referred to throughout these proceedings as the "Dear Operator" letter, stated that Stoner was "now interested in the new Lektro-Vend Corp.," and "if Lektro-Vend can depend on your confidence . . . I guarantee that Lektro-Vend Corp. will be here for a very, very long time."

It appears from the evidence that Mr. Stoner has never been active in the day-to-day management of Lektro-Vend, and that he does not maintain a desk or office on the corporation's premises. The frequency with which

he comes onto the premises varies—sometimes every day for a week, and sometimes not at all for a month. He is, however, consulted on financial and other matters.

Vendo filed its complaint herein on August 10, 1965, charging that Stoner and Stoner Investments breached their respective covenants against competition, which covenants are set forth above. An amendment to the complaint was filed on January 28, 1966, alleging that both defendants stole valuable trade secrets of Vendo, including the design for certain vending machines, which they appropriated for their own use and for the use of Lektro-Vend Corporation. The complaint, as amended, prayed for damages of $1,500,000 and for injunctive relief prohibiting defendants from engaging in the vending machine business. Neither Lektro-Vend nor either of the Phillipses was made a defendant.

At the conclusion of a bench trial, the court entered judgment against Stoner in the amount of $250,000, and against both Stoner and Stoner Investments in the amount of $1,100,000. In addition, both defendants were enjoined from engaging, directly or indirectly, in the business of manufacturing (and, in the case of Stoner Investments, selling) vending machines until June 1, 1969 in the United States and in any foreign country in which Vendo was engaged in such business on June 1, 1959.

In support of this appeal, defendants urge the following grounds: (1) that Vendo did not possess a trade secret; (2) that in any event there was no appropriation of such a trade secret, assuming it existed; (3) that the covenants against competition are invalid; (4) that in any event the covenants were not violated; (5) that damages were improperly assessed; (6) that the injunctive relief granted was unwarranted because of an insufficient showing of irreparable damage, and because it was vague and beyond the prayer of the complaint; and (7) that the trial court erred in striking the affirmative de-

fenses and counterclaim based on the plaintiff's alleged violation of the Federal and Illinois Antitrust laws.

## The "Trade Secrets"

■ We agree that plaintiff has not proven the appropriation of a trade secret, if indeed it has been shown that plaintiff even possessed a trade secret. Plaintiff had nothing more than a goal in mind—the goal of economically producing a FIFO machine with a see-the-bar-you-vend feature. However, plaintiff had not discovered a means of achieving this goal, and without this discovery plaintiff had nothing. There was no evidence offered to show that Vendo's goal or overall desire to produce such a machine was novel. Furthermore, the individual features which Vendo wanted to combine in a single machine were long and widely used in the industry.

If Vendo had discovered the *means* for achieving its goal, we might well have had a different view as to whether Vendo had a trade secret. But trade secrets evolve from the means—not the end. According to the American Law Institute Restatement, Torts, § 757, Comment b, a trade secret may consist "of any formula, pattern, device or compilation of information . . . ." Schulenberg v. Signatrol, Inc., 33 Ill2d 379, 385, 212 NE 2d 865 (1965), cert den, 383 US 959, states:

> "The controlling definition of a trade secret in Illinois is supplied by Victor Chemical Works v. Iliff, 299 Ill 532, 540, 132 NE 806, where this court said that it is *a secret plan or process, tool, mechanism or compound* known only to its owner and those of his employees to whom it is necessary to confide it." (Emphasis added.)

We know of no authority for the proposition that an ultimate goal or purpose, as distinguished from the means of achieving it, can be classified as a trade secret. On

the contrary, the authorities teach us that the trade secret must be in the plaintiff's "know-how," and Vendo simply did not "know how" to construct the particular machine it desired. This is evident from the record, where we see minutes of a Vendo meeting stating that the machine design "is *not acceptable* because of loading and inventory problems," and that the corporation "is to continue research as to how to basically improve the stock rotation idea *so that it can be made practical.*" (Emphasis added.)

 Apart from our conclusion that Vendo could not claim a trade secret in its models, the vast difference between these models and the Lektro-Vend machine, in terms of technology and design, is in itself sufficient to preclude recovery on the theory of the appropriation of a trade secret. The more essential differences are set forth above, and the success and acceptance of the Lektro-Vend machine, compared to the unacceptability of Vendo's, speak for the materiality of these differences. And Vendo's theory of appropriation can hardly stand in the face of its previous attempts to purchase the Lektro-Vend machine and pay some amount of money for the "ingenuity which [the Phillipses] had expended on the project." The fact that the Phillipses worked for approximately eighteen months on the Lektro-Vend machine before their prototypes were ready is, in itself, evidence that they did not "steal" Vendo's methodics.

 A final observation should be made on the question of whether defendants appropriated a trade secret. Before such a cause of action will lie, it must be shown that the secret was disclosed to or learned by the defendant while in a position of trust and confidence. Victor Chemical Works v. Iliff, 299 Ill 532, 548, 132 NE 806 (1921). In our opinion, the record before us falls far short of showing wherein the Vendo design was disclosed to or learned by Mr. Stoner. Sometime after the acquisition of the Stoner plant, Mr. Stoner was shown

pictures of a manual FIFO candy machine which did not have a stock display window. Stoner replied that this machine was similar to an Orange Crush machine which his corporation had built in 1940. While Mr. Stoner was present at the products planning meeting on August 3, 1959, where the Vendo model was shown, he was at the meeting for no longer than a few minutes. One witness, who is no longer employed by any of the parties, testified that Mr. Stoner was at that meeting for somewhere between thirty seconds and three minutes. It further appears that Mr. Stoner's presence at the meeting was for other purposes, and that the meeting was in fact suspended during his brief appearance. In the words of a Vendo employee, it was then and there that the Vendo machine was "kind of" explained to Stoner.

It cannot seriously be contended that these brief glimpses and glances could be the foundation for the development of a revolutionary design that would take several skilled people eighteen months to develop. The only other evidence of disclosure relates to the Phillipses, not to Stoner. Thus, Rod and Bill Phillips were shown artists' sketches of the machine at about the time of the acquisition, or about one year prior to the Phillipses resignations from Vendo, and fully 1½ years before Rod began work on what was to become the Lektro-Vend machine. While Rod was at the products planning meeting on August 3, 1959, he was there only to help answer the question of whether such a machine could be produced at the Stoner plant. Neither the Phillipses nor the Lektro-Vend Corporation was made party to this suit. Although that, standing alone, would be no defense to Stoner, for one may not employ others to appropriate trade secrets which he himself might not appropriate (e. g., Colgate-Palmolive Co. v. Carter Products, Inc., 230 F2d 855, 864 (4th Cir 1956), cert den, 352 US 843 (1956), reh den, 352 US 913 (1956), we simply fail to see where sufficient information was disclosed to or learned by the Phillipses to enable them to design and develop the Lektro-

Vend machine. The evidence does not indicate that they were shown measurements, tolerances, materials, and the like, nor is there evidence that they made or were given pictures or drawings of what they were briefly shown.

## The Covenants Not To Compete

Defendants next contend that the covenants against competition by Stoner and Stoner Investments are invalid and unenforceable as constituting unreasonable restraints of trade, and that these covenants, even if valid, were not breached by defendants.

■ ■ The general rule is that a covenant against competition, ancillary to the sale of a business or an employment contract, will be upheld if the restraint on trade is reasonable in terms of time and territory, with the question of reasonableness depending on the circumstances of each case. E. g., Storer v. Brock, 351 Ill 643, 184 NE 868 (1933); Parish v. Schwartz, 344 Ill 563, 176 NE 757 (1931); Lanyon v. Garden City Sand Co., 223 Ill 616, 79 NE 313 (1906); Andrews v. Kingsbury, 212 Ill 97, 72 NE 11 (1904); Union Strawboard Co. v. Bonfield, 193 Ill 420, 61 NE 1038 (1901); Lanzit v. J. W. Sefton Mfg. Co., 184 Ill 326, 56 NE 393 (1900); Hursen v. Gavin, 162 Ill 377, 44 NE 735 (1896). This general rule has been interpreted in Illinois by a line of cases beginning with Parish v. Schwartz (supra), to mean that any such restraint covering the *entire* State of Illinois is, on its face, unreasonable and therefore void. The rationale of this rule is that no person should be required to leave the state in order to pursue his regular occupation, nor should the people of the state be totally deprived of his labors. It is on this proposition which defendants rely.

However, in spite of the widespread acceptance of this general rule, the courts of this and other jurisdictions have come to recognize an exception, which we believe applicable here, where the restraint lasts during the contractual relationship of the parties. Stated differently,

281

the territory covered by a covenant against competition, otherwise unreasonably broad, will not invalidate the covenant to the extent that it exists during the terms of the employment, lease, franchise agreement, etc.

The earliest case known to us which recognizes this exception to the general rule is Harrison v. Glucose Sugar Refining Co., 116 F 304 (7th Cir 1902). There the defendant had agreed that *during the term of his employment* he would not work for any glucose manufacturer other than the plaintiff within a 1,500 mile radius of Chicago, an area encompassing practically the entire United States. The court held the covenant valid and enjoined its violation. In distinguishing this *in-term* covenant case from those involving *post-term* covenants— i. e., covenants not to compete *after* employment or *after* the sale of a business—the court said (at p 310):

> "Here the restriction is limited to the period of service engaged for. The appellant left without cause and to enter the service of a rival. There was no acquiescence by appellee . . . . Clearly, under such circumstances no public policy would be violated in upholding the covenant. He is not deprived of the opportunity to obtain the means of subsistence or of giving to the public the benefit of his skill in the business to which he has been accustomed. He has only to perform the duty which he engaged to perform to render himself and his family comfortable. We know of no public policy which requires us to sanction the bald violation of a contract lest the public should be deprived of the peculiar skill of the appellant because he will not exercise that skill where he has engaged to exercise it."

The distinction between in-term and post-term covenants was similarly recognized in Saul v. Thalis, 156 F Supp 408, 411 (DCDC 1957), where the court stated:

". . . this case involves an agreement of employment for a fixed term containing a covenant which restricts the employee from engaging in a competing business during the term of employment fixed by the agreement. The validity of such covenant cannot be questioned so long as the employee remains in the employ of the employer."

In Good v. Modern Globe, Inc., 346 Mich 602, 78 NW2d 199 (1956), an employment contract provided that the employee, "for the above specified period [the term of employment] . . . will not, without prior written consent of the company, become employed, directly or indirectly, by any manufacturer of knitted goods or products presently manufactured by the company. . . ." The Michigan Supreme Court sustained the validity of this covenant, even though Michigan had a sweeping statute invalidating all contracts not to engage in business.* The court stated (at p 204):

> "The plain language of this contract indicates that it is a contract of employment, not a contract whereby Good undertook not to engage in employment. A provision therein which forbade Good to become employed by any knitted goods manufacturer of products competitive to Globe's, is a provision which any employer would certainly have a right to contract for from any employee *for the duration of his employment.* The contract in question is not void under CL 1948, § 445.761, Stat Ann 28.61." (Emphasis supplied.)

---

* Mich Stats Ann § 28.61 (1948): "All agreements and contracts by which any person, co-partnership or corporation promises or agrees not to engage in any avocation, employment, pursuit, trade, profession or business, *whether reasonable or unreasonable,* partial or general, limited or unlimited, are hereby declared to be against public policy and illegal and void." (Emphasis added.)

In 1963, this court was squarely faced with the question of whether to follow or reject the "in-term—post-term" distinction, and we chose to follow it. McDonald's Systems, Inc. v. Sandy's, Inc., 45 Ill App2d 57, 195 NE2d 22 (1963). In McDonald's, the individual defendants had been granted a ten-year franchise by the plaintiff to operate a single drive-in restaurant in Urbana, Illinois. Paragraph 8 of the franchise agreement provided essentially as follows:

> *"During the effective term of this agreement,* Second Party [defendants] shall not, except with the consent of First Party [plaintiff], engage in any business the same as or similar to the business covered by this agreement at any place other than the premises heretofore described in the State in which said premises are located or at any place in a state contiguous to said State . . . ." (Emphasis added.)

Notwithstanding this covenant, the defendants, during the term of the franchise, organized a corporation to own and operate a similar drive-in restaurant in Peoria. In a suit brought by the plaintiff to enjoin the continued violation of the covenant and for damages, the trial court held that the restraint was unreasonably broad and that the covenant was therefore void. The opinion of this court reviewed the authorities discussed above (Harrison v. Glucose Sugar Refining Co. (supra); Saul v. Thalis (supra), and Good v. Modern Globe, Inc. (supra, at p 75)) and reversed the trial court, stating:

> "Under these and other authorities *the extent of the territorial restriction is a factor which affects the validity of a post-term covenant only.* In the instant case the covenant is an in-term, not a post-term, covenant, and *as long as appellees seek to avail themselves of the beneficial provisions of their franchise contract, they should not be permitted to dis-*

284

*regard or refuse to abide by the several obligations they assumed.* The contract was not of unlimited duration, and when the franchise term is ended, either by cancellations, or by the expiration of time, appellees are free to engage in similar business elsewhere without any franchise. There is nothing illegal in such an agreement, and the obligations of the respective parties should be respected and enforced." (Emphasis added.)

Other Illinois decisions have recognized the distinction between in-term and post-term covenants not to compete. In Ellis Electrical Laboratory Sales Corp. v. Ellis, 269 Ill App 417 (1933), the court upheld the agreement of a supplier of goods not to sell such goods to others during the term of the agreement. In Southern Fire Brick & Clay Co. v. Garden City Sand Co., 223 Ill 616, 79 NE 313 (1906), the Illinois Supreme Court upheld a lessor's covenant not to compete with his lessee during the term of the lease, notwithstanding that the restriction was statewide. In Match Corp. of America v. Acme Match Corp., 285 Ill App 197, 1 NE2d 867 (1936), the court enforced the defendant's promise that it would not, during the term of the contract, sell book matches in competition with the plaintiff, with no area limitation.

■■ Under the precedent thus established, we are constrained to hold that the covenant before us is valid and enforceable. The covenant of Mr. Stoner was unquestionably in-term during the first five years, since that was the duration of his employment contract with Vendo. It was within that period of time that he violated his covenant. During the post-employment period, or the additional five years, Stoner's activities were simply an affirmation of his prior violation—a retention of the fruits of his breach—and upholding his post-employment activities would be tantamount to our sanctioning his earlier breach. That the post-term aspects of the covenant might, if standing alone, be unnecessarily

285

broad, is therefore irrelevant to the disposition of this appeal. In any event, Stoner Investments, the corporation through which Stoner chose to exercise his breach, was his alter ego, and Stoner Investments entered into a covenant of its own which we characterize as in-term. The sale of assets to Vendo contemplated a ten-year relationship with Stoner Investments as well as with Mr. Stoner. The contract required Vendo to pay Stoner Investments, for a period of ten years from January, 1959, all profits in excess of $250,000 earned by Vendo from the assets sold. In addition, Stoner Investments was to be paid during this same ten-year period 25% of all monies Vendo was to receive from foreign production of products then under development by Stoner Investments. As we said in McDonald's (supra at p 75), during that period of time which defendants "seek to avail themselves of the beneficial provisions of their . . . contract, they should not be permitted to disregard or refuse to abide by the several obligations they assumed." Surely under these facts, and in view of the complete ownership of Stoner Investments by Stoner and his wife, and Stoner's complete dominion of the corporation, we must consider the covenants of each to be coextensive to be meaningful. In short, the sale of assets to Vendo represented a transaction which the parties contemplated would take ten years to consummate. The ten year restraints are therefore "in-term" under the teaching of McDonald's and other cases, and are valid and enforceable.

Defendants argue that the noncompetition clauses were not in fact violated by their conduct. They reason that the conduct complained of consisted only of paying salaries, making loans, furnishing sites and facilities, and holding stock, and that such activities, since not specifically prohibited, are authorized. Indeed, cases are cited for the proposition that the lending of money to plaintiff's competitor does not violate the lender's covenant not to compete (Battershell v. Bauer, 91 Ill App 181,

182 (1900); Sineath v. Katzis, 218 NC 740, 12 SE2d 671, 681 (1941); Gallup Elec. Light Co. v. Pacific Improvement Co., 16 NM 86, 113 P 848, 850 (1911)), that the granting of a lease to a competitor is likewise not tantamount to engaging in competition (Wineteer v. Kite (Mo App), 397 SW2d 752, 759 (1965); Ericson v. Jayette, 149 Fla 82, 5 So2d 453, 454 (1942)), and that both lending *and* leasing is not a violation of such a covenant (McKeighan Wachter Co. v. Swanson, 138 Wash 682, 245 P 10, 11 (1926)), affd 141 Wash 694, 250 P 353.

■ Defendants, however, have done considerably more than merely make loans and leases to a competitor. They literally paid the salaries of the competitor and its employees, they furnished a building rent-free and guaranteed the loan by which the competitor could purchase another building from them, they took a sizeable amount of stock in the competing venture within days of the time they thought they could legally do so, and they made several large loans at no or low interest. Clearly, these activities show that defendants were closer than arm's length to the development of the Lektro-Vend machine. To suggest otherwise attributes a great deal of naiveté to this court. Even the cases cited by defendants are expressly limited to those situations where the defendant lender or defendant-lessor does not encourage and has no interest in the business of the competitor. E. g., Gallup Elec. Light Co. v. Pacific Improvement Co. (supra at p 851); Sineath v. Katzis (supra); McKeighan Wachter Co. v. Swanson (supra); Wineteer v. Kite (supra).

We sustain the trial court's finding that defendants' activities amounted to the direct or indirect entering into or engaging in the vending machine business.

### The Assessment of Damages

As noted above, the trial court entered judgment against Stoner and Stoner Investments for $1,100,000, and against Stoner alone for $250,000. The larger judg-

ment was based upon evidence tending to show that the value of the Lektro-Vend machine was approximately $1,500,000 that Stoner himself believed this to be what the machine was fairly worth and that the approximate cost necessary to develop such a machine would be $400,000. The machine thus represented a potential profit to its developers, as it then stood, of $1,100,000. The $250,000 judgment represented a return of the entire salary Stoner received during his five years of employment by Vendo.

Although the judgment order did not specifically apply these judgments between the two theories of recovery set forth in Vendo's complaint, as amended, the briefs and arguments of the parties in this court have treated the $1,100,000 judgment as arising out of the trade secret theory, and the $250,000 as applicable to the breach of the covenants not to compete. We agree that this appears to have been the reasoning of the trial court.

Our conclusion that Vendo has not proven a theft or appropriation of a trade secret precludes any recovery on that theory. We are thus limited to ascertaining the proper measure of damages for the breach of the covenants not to compete.

At the outset, we agree that such a breach of Stoner's fiduciary undertaking as an employee in the instant case requires a forfeiture of salary during the period that the breach was occurring. Ely v. King-Richardson Co., 265 Ill 148, 153, 106 NE 619 (1914); National Lock Co. v. Aldeen, 271 Ill App 37, 40 (1933); Evangelista v. Queens Structure Corp., 27 Misc2d 962, 212 NYS2d 781 (1961); Harry R. Defler Corp. v. Kleeman, 19 App Div2d 396, 243 NYS2d 930, 938 (1963). In fact, none of the parties seriously question this general rule, their main dispute being to define the period of the breach. Plaintiff contends that the breach began immediately after the signing of the sales and employment agreements, but before the take-over, when Stoner spoke to the busi-

288

ness representative of the union representing the plant employees for the alleged purpose of frustrating the sale. Plaintiff thus urges that all of Stoner's salary during his five-year employment, or $250,000, should be recoverable. Defendants, on the other hand, contend that even if a breach existed, it cannot be traced prior to about January, 1961, the time when defendants began making loans to Rod Phillips. It is our opinion that defendants' view is the more reasonable in this respect.

Nothing came of Stoner's brief conversations with the union representative, even construing them in their worst light, and we attach no legal significance to them. We have more trouble justifying the events of mid-1960, when Bill Phillips began receiving financial aid from defendants to develop his electronic coin detecting device. Even here, however, we cannot conclude that Stoner's activities were a part of his overall breach. A coin detecting device has so many uses outside the vending machine industry (slot machines, coin counters for busses and telephone companies, toll road collectors, parking meters, etc.), that its development is not necessarily a step toward "engaging" in such industry. In any event, this detector was never built or put to use, and its development, as far as the record discloses, did not contribute materially to the evolution of the Lektro-Vend machine. Defendants' breach, therefore, originated at the end of 1960 or in the beginning of 1961, when the extensive loans to Rod Phillips started, when defendants began paying salaries to Rod Phillips' employees, when the Middle Avenue Building was made available for the Phillips' use, and, in short, when the first breaths were blown into the Lektro-Vend machine.

When did the breach end? Defendants say the breach, assuming it existed at all, ended in December, 1962. But defendants would have us overlook the fact that in 1963 they gave the Phillipses the use of the Sullivan Road Plant, and in 1964 they in effect guaranteed the loan

which enabled the Phillipses to purchase this plant.
This transaction was completed within a few weeks of
the end of Stoner's employment contract.

In view of the foregoing, we are of the opinion that
the defendants' breach lasted throughout 1961, 1962,
1963, and through May, 1964, a total of approximately
three years and five months. Inasmuch as this cause
will be remanded for reasons stated below, the trial court
will be in a position to make a more precise determination
as to the period of the breach and salary forfeiture,
having this opinion in mind.

 In addition to the recovery of the salary
paid Stoner during the breach, Vendo would be entitled
to recover any damages to its business occasioned there-
by. This would be the measure of lost profits to Vendo
during the period of the breach, plus the diminution of
its business at the end of the period covered by the
covenants. Mirkovich v. Maravich, 206 Ill App 463 (1917)
(Abst). Other Illinois decisions holding that the measure
of damages in such a case is the provable loss to the
covenantee, and not the gain accruing to the covenantor
by reason of his breach, include Henry's Drive-In, Inc.
v. Anderson, 37 Ill App2d 113, 125, 185 NE2d 103 (1962);
Stewart v. Challacombe & Ramsey, 11 Ill App 379, 383
(1882); Bauwens v. Goethals, 187 Ill App 563, 567, 568
(1914). See also the annotation in 127 ALR 1152 (1940),
where cases from all jurisdictions are cited in support of
this general rule.

Conceding the difficulty of ascertaining such damages,
we repeat what was said in Stewart v. Challacombe &
Ramsey (supra, at p 382):

> "This difficulty [of ascertaining damages] has long
> been recognized, and it is for this reason that courts
> of equity interfere by injunction to restrain parties
> from entering into trade in violation of such con-
> tracts, and for the same reason it has become usual
> to insert in such agreements a sum certain to be

paid in case of violation, as liquidated damages. Such considerations, however, cannot authorize a change of the fundamental rules of law. As was said in Terry v. Eslora, 1 Porter, 273, such difficulties 'are intrinsic in the subject about which the parties have chosen thus loosely to contract.' "

The foregoing language was cited favorably in Bauwens v. Goethals (supra, at p 569), where the court added:

"A party may not sell a prospect for a valuable consideration received and on breach of his contract defend on the ground that the subject-matter is of too uncertain value to permit its measurement in a court of law."

Applying these precedents to the case before us, we see that the value of the Lektro-Vend machine, which the trial court found to be $1,100,000 after deducting estimated development costs, is neither an element nor a yardstick of damages for a breach of the noncompetition covenants. While this figure may represent the gain to Stoner and his associates, it does not necessarily reflect the damage to the plaintiff. We hold instead that Vendo should be permitted to recover an amount equal to the net profits it lost and might reasonably be expected to lose, plus the amount by which the value of its business will have been diminished as of June 1, 1969, because of defendants' wrongful competition.

On remand, the trial court should determine the extent of these damages. To the extent that the record is wanting of proof on this issue, the court below will entertain further evidence of such damages. A similar situation developed in the appeal of Henry's Drive-In, Inc. v. Anderson (supra, at p 128), where it was said:

"Where a material question is in controversy upon a material issue and the record discloses that all

291

the evidence on that issue has not been produced, this court has the power to reverse the judgment and remand the cause for the taking of further evidence, on the part of either or both of the parties, upon the issues. [Citing cases.] In this case the judgment must be reversed and the cause remanded to the trial court in order that loss of net profits may be proved."

 Defendants argue that no damages whatsoever can be assessed against Mr. Stoner, even if he were found to have breached a valid noncompetition covenant, because the employment contract provided that Vendo "shall have the right to terminate this agreement upon thirty (30) days' notice in the event of the substantial violation of the terms hereof by Stoner." Thus, defendants maintain that this provision constitutes an implied waiver by Vendo of its right to damages in the event of a breach, and that Vendo in effect agreed that its only remedy for a substantial breach would be termination of the employment contract. We cannot accept this argument. We see nothing in the contract to suggest that Vendo intended to waive its remedial rights by expressing its right to terminate an employment contract breached by its employee, a right that it would have even without such a provision. Suppose Stoner had literally stolen a large amount of cash from Vendo; would defendants argue that Vendo's only remedy would be to discharge Stoner, and that it would have no right to recover the stolen cash?

### The Injunctive Relief

The injunctions granted below restrained Stoner and Stoner Investments "from engaging, directly or indirectly" in the vending machine business until June 1, 1969, in the United States or any foreign country in which Vendo engaged in such business as of the date of the acquisition of the Stoner plant.

In opposition to this injunctive relief, defendants first argue that there were no allegations or proof as to Vendo's irreparable damage. As respects defendant Stoner, however, we believe a sufficient allegation of irreparable damage is made in paragraph 9 of the complaint, which provides:

> "9. That unless restrained by an Injunction of this Court, the defendant, Harry B. Stoner, will continue at his engagement in the foresaid enterprises and cause continuing irreparable damages to the plaintiff, The Vendo Company, and will cause the plaintiff irreparable damages in the future."

The complaint also prays for injunctive relief against defendant Stoner.

On the other hand, Count II of the complaint, directed against Stoner Investments, is totally silent both as to an allegation of irreparable damage and as to a prayer for injunctive relief. As long as decisions of this court have been reported, it has been held that "a party . . . seeking relief by way of injunction, must specifically pray for such relief, otherwise the court will not aid him." Willett v. Woodhams, 1 Ill App 411, 413 (1877). Inasmuch as plaintiff has made no motion to amend either the allegations or the prayer of its complaint in these respects, the court erred in ordering an injunction against the corporate defendant.

As against the individual defendant, Mr. Stoner, we conclude that the injunctive relief was justified. The evidence showing that Lektro-Vend machine's impact on the vending machine industry, coupled with the proof of Stoner's influence in the development of that machine, is ample to warrant the finding, implicit in the issuance of the injunction, that Vendo suffers actual or threatened irreparable injury from Stoner's wrongful activities. Further, we are of the opinion that the scope of the injunction granted is reasonable in light

of the evidence adduced at the trial, and is consistent with the allegations and prayer of the complaint. The restraint imposed by the injunction is no more broad than the restraint imposed by Stoner's employment contract, and since we have already concluded that the latter is reasonable in view of the facts before us, we must conclude that the injunction is equally reasonable.

In any event, the injunction is not now in force by reason of the failure to file a bond, and by its terms is to terminate on June 1, 1969. In these circumstances, further comment on this aspect of the appeal is at best gratuitous.

### The Antitrust Defenses and Counterclaim

By way of affirmative defense, it was alleged that the contracts sued upon violated the Illinois and Federal Antitrust laws and were therefore invalid and unenforceable. Defendants also counterclaimed under the Illinois Antitrust laws for treble damages. The trial court, reasoning that a state court has no jurisdiction to hear a federal antitrust defense, struck the defense founded on the federal statutes. The defense and counterclaim based on the Illinois Antitrust law of 1891, which was in force at the time of the contract between the parties, was stricken on the theory that the statute related only to agreements to fix prices and production, neither of which was alleged in these proceedings, and also because the commerce involved was interstate rather than intrastate. The 1965 Illinois Antitrust law was held inapplicable for the additional reason that it had not been enacted until after execution of the agreements sued upon.

In our review of the striking of these pleadings, we shall consider first the defense asserting the federal laws, and thereafter the defense and counterclaim based on the Illinois statutes.

294

## The Federal Antitrust Defense

■■■ It was held below that the Illinois courts are without jurisdiction to consider a defense created by the federal antitrust statutes. We are aware of no Illinois precedent which would support this holding. On the contrary, it appears that the Illinois courts have on more than one occasion passed upon the merits of a defense based on the federal antitrust laws.

In Corn Products Refining Co. v. Oriental Candy Co., 168 Ill App 585 (1912), a contract provided that the plaintiff would, on December 31, deliver a price rebate to the defendant if the latter purchased all of its annual requirements of unmixed corn syrup from the plaintiff. On December 24, the defendant unilaterally deducted the amount of such rebate from a payment due plaintiff. The plaintiff brought suit for the amount of the deduction, alleging that the defendant had purchased certain of its syrup requirements from others, and that in any event the rebate was not earned until December 31. As a defense, defendant alleged that the plaintiff was a monopoly in restraint of trade in violation of federal and Illinois law. Although affirming a decision in favor of the plaintiff, the court observed at page 589:

> ". . . if it be a fact that defendant in error was and is an unlawful combination and had violated the Federal Anti-Trust Laws, as charged by plaintiff in error, such fact would not defeat the defendant in error in its suit for the recovery of the purchase price of property sold by it under a contract collateral to such wrong committed by it. In order for such a defense to prevail, the contract sought to be enforced must have been made to further the objects of the illegal combination. This was the rule under the common law, and it is also the rule under The Federal Anti-Trust Law, as declared by

the Federal Courts, and by those decisions the courts of this state are bound."

The holding of the Corn Products case is that where the contractual provision sued upon is itself a violation of the federal statutes, the Illinois courts will entertain such a defense, but that the antitrust defense does not afford a defense where it is collateral to the provision sued upon. In any event, the mere fact that the defense is predicated on the federal statutes does not in itself deprive the state court of jurisdiction to hear and pass upon it.

Merchants Service Corp. v. Libby, McNeill & Libby, 314 Ill App 121, 40 NE2d 835 (1942), is another case supporting our view that the court below erred in striking the federal antitrust defense on the pleadings. There, in a suit for unpaid brokerage commissions, the defense asserted that the payment of the commissions would violate the Robinson-Patman Act, the federal law prohibiting certain pricing discriminations. While the contract between the parties predated the federal act, the sales giving rise to the disputed commissions were made after the legislation. The court stated that the principal question was the applicability of the statute where the sales contracts were initiated before and the sales completed after the effective date of the act. After holding that Congress intended to cover such transactions, and that this would not violate the Constitutional prohibition against the impairment of contracts, the court reversed the trial court and entered judgment in favor of the defendant, saying at page 129:

". . . defendant could not pay and plaintiff could not receive or accept the commissions or price discounts for which this action is brought without violating the plain provisions of the Robinson-Patman Act."

296

See also, Cummings-Landau Laundry Mach. Co. v. Koplin, 316 Ill App 306, 44 NE2d 613 (1942) (Abst), affd in part and revd in part on other grounds, 386 Ill 368, 54 NE2d 462 (1944).

On the strength of the foregoing Illinois authorities, in opposition to which the plaintiff has not cited a single Illinois case, we hold that the trial court erred in striking the federal antitrust defense without a hearing. Plaintiff's reliance on Bruce's Juices, Inc. v. American Can Co., 330 US 743 (1947), is misplaced, since that decision in no way considered a state court's jurisdiction to hear and adjudicate a federal antitrust defense to a contract action. Instead, that case dealt only with the specific remedies afforded by the Robinson-Patman Act, and in no way distinguished between the jurisdiction of the federal and state courts.

### The Illinois Antitrust Defenses and Counterclaim

▪ The principal question here is not whether the Illinois Antitrust laws have been violated, but instead whether the interstate nature of the parties' businesses renders these state laws inapplicable under the doctrine of federal preemption. If the question be resolved in the negative, it would be necessary to consider the merits of the defenses and counterclaim based thereon.

We believe that Kosuga v. Kelly, 257 F2d 48 (7th Cir 1958), affd 358 US 516 (1959), rehearing den, 359 US 962, is dispositive of this question in favor of plaintiff. In Kosuga, the plaintiff brought suit for the purchase price of onions sold by it to the defendant. The allegation that the contract violated the Illinois Antitrust laws was pleaded as an affirmative defense. The District Court struck this as well as other defenses, and entered judgment in favor of the plaintiff. In affirming the striking of this defense, the Court of Appeals announced at page 55:

*"The Illinois Act as the substantive law of the State is applicable only to intrastate commerce.* Defendant apparently so recognizes and argues that such commerce was involved inasmuch as the contract of sale was made and was to be performed in the State of Illinois. Defendant makes this argument in spite of the frequent allegations in his pleadings that 'said onions which were the subject of said agreement and contract were a part of interstate commerce.' In 15 CJS Commerce § 133(b), it is stated that 'state anti-trust laws do not apply to transactions involving interstate commerce . . . .' *It is hardly open to doubt but that the transaction in issue involved interstate commerce. It is, therefore, our view that the Illinois Act is without application."* (Emphasis added.)

Nowhere have defendants pleaded or argued that the commerce involved here is anything but interstate. Indeed, the business covered by the contracts before us is not only interstate, it is international. It follows, under the doctrine announced in Kosuga, that the trial court properly struck the affirmative defenses and counterclaim founded on alleged violations of the Illinois Antitrust laws.

It should be noted that defendants attempted without success to distinguish Kosuga by arguing in their brief that "the only reason the Seventh Circuit held the Illinois Anti-Trust Act inapplicable was because it *was not* pleaded as a defense to the action." (Emphasis in original.) Not so. The opinion of that court specifically states in at least two passages that the defendant's reliance on the Illinois Antitrust laws was before the court by way of "affirmative defense." (See pages 50, 55.) We read nothing in the opinion to suggest that this defense was not pleaded, contrary to defendants' assertion without citation.

Our conclusion that the Illinois Antitrust laws are inapplicable renders unnecessary any discussion as to the interpretation of these laws and the remedies which they provide either by way of counterclaim or affirmative defense.

For the above reasons, the judgment of the trial court is affirmed in part, reversed in part, and remanded for further proceedings consistent with the views expressed herein.

Affirmed in part, reversed in part, and remanded.

MORAN, P. J. and ABRAHAMSON, J., concur.